EBASCO SERVICES, INCORPORATED

v.

PENNSYLVANIA POWER &
LIGHT COMPANY

v.

GENERAL ELECTRIC COMPANY.

Civ. A. No. 72–1030.

United States District Court,
E. D. Pennsylvania.

Sept. 27, 1978.

See also, D.C., 402 F.Supp. 421.

166

K. Robert Conrad, Jon A. Baughman, Nancy J. Gellman, Peter F. Marvin, Deborah S. Cohen, Pepper, Hamilton & Scheetz,

Philadelphia, Pa., for Pennsylvania Power & Light Co.

Henry T. Reath, Michael M. Baylson, Duane, Morris & Heckscher, Philadelphia, Pa., for General Electric Co.

## OPINION

EDWARD R. BECKER, District Judge.

### I. *Preliminary Statement*

This opinion memorializes our findings of fact and conclusions of law in the wake of a lengthy trial in which Pennsylvania Power & Light Company (PP&L) sought to establish that General Electric Company (GE) was liable to it for certain consequential damages, principally cost of replacement power, as the result of GE's role in the construction of a power plant.

PP&L is a public utility that furnishes electric power to large areas of eastern and central Pennsylvania. A large PP&L power plant complex is located at Brunner Island in the Susquehanna River, south of Harrisburg, Pennsylvania. In 1964, recognizing the need to augment its generating capacity to meet the area's growing electric power demands, PP&L determined to erect on Brunner Island an additional generating plant to be known as Brunner Island # 3 (Brunner # 3). On previous occasions PP&L had superintended the erection of its own power plants, letting various contracts and subcontracts for the several portions of the work. However, on this occasion PP&L engaged Ebasco Services, Inc. (Ebasco) to undertake complete responsibility for the construction of the plant on a so-called "turnkey" basis. Under this arrangement, Ebasco was to assume the responsibility for designing the plant, selecting appropriate equipment and contractors, supervising construction and testing, obtaining appropriate performance guarantees, and overseeing all aspects of the project until the plant became operational. At that time, the key would be turned over, as it were, to the owner, PP&L. The PP&L-Ebasco agreement, entered into in 1964, was formally executed on March 10, 1966. Under its terms, PP&L was to pay Ebasco a total of $54,300,000, payable in installments over the construction period, with a $3,640,000 retainage to be paid by PP&L only after it was satisfied that Ebasco had fulfilled the performance guarantees in the contract.

In March 1964, Ebasco, acting as the agent for PP&L, began obtaining subcontractors for the plant. The other parties to this action—GE, Foster Wheeler Corporation (Foster Wheeler), and Combustion Engineering Company (Combustion)—are firms that were engaged by Ebasco to furnish and install major components of the power plant. GE's principal contractual undertaking was to supply the steam turbine generator and boiler feed pump turbines, which together could fairly be described as the heart of the power plant. Combustion supplied the boilers necessary to create the steam that powers the turbines, and Foster Wheeler supplied the elaborate pumps that the power plant requires.

The power plant was ultimately completed in 1970. In 1972, seeking some $1 million in retention moneys that PP&L had refused to disburse plus an additional $1.6 million in expenses above the contract specification, which Ebasco claimed it had incurred at PP&L's request, Ebasco commenced this litigation. PP&L counterclaimed against Ebasco for damages allegedly resulting from delay, use of unauthorized bidders, breach of warranty, and negligence. PP&L, as third-party plaintiff, also joined GE, Foster Wheeler, and Combustion as third-party defendants on its counterclaim.

PP&L's counterclaim against GE seeks damages allegedly resulting from (1) furnishing defective equipment; (2) negligent design and installation supervision of the steam turbine generator and boiler feed pump turbines; (3) breach of implied warranties; and (4) tortious interference with certain of PP&L's contract rights. The total damages asserted by PP&L approximate $64 million. The largest single element of these damages is PP&L's claim against GE for the cost of purchasing replacement power from other power companies in the Pennsylvania-New Jersey-Maryland Interconnec-

tion (PJM), which became necessary when Brunner # 3 did not function as anticipated.[1]

After discovery was substantially complete, GE, Combustion, and Foster Wheeler filed motions for partial summary judgment. We proceeded to argument first on GE's principal motion, which involved Ebasco purchase order NY–668001, relating to the steam turbine generator and boiler feed pump turbines. In that motion, GE asked us to declare that it was not liable on the contract to PP&L for (1) cost of replacement power or lost profits; (2) breach of an alleged implied warranty of fitness for an intended use; or (3) tortious interference with the contractual rights of PP&L. The issues with which the motion dealt evolved in large measure from the parties' differing views as to what documents or acts formed the contract between GE and Ebasco (the latter acting as agent for PP&L) and as to the terms of that contract.

We disposed of GE's motion by a lengthy opinion, *Ebasco Services, Inc. v. Pennsylvania Power and Light Co.*, 402 F.Supp. 421 (E.D.Pa.1975) (*Ebasco I*), in which we denied partial summary judgment. Because *Ebasco I* formed the general charter for the trial that is adjudicated herein, we must summarize the salient features of that opinion as a precondition to clear and orderly presentation of our findings of fact and conclusions of law. Understanding of those salient features in turn requires a brief recitation of some of the background facts

and of the issues raised in the partial summary judgment motion.

The inception of the steam turbine generator transaction was in a telephone conversation on July 15, 1964, between Charles Bonin of Ebasco and George Cox of GE. What transpired during that important telephone call is in dispute, and we make findings on the subject. *See* Part II.B. *infra.* However, it is undisputed that on that day, acting pursuant to Ebasco's request, GE issued by means of a letter to Ebasco quotations for the steam turbine generator and the boiler feed pump turbines. The letter stated, *inter alia* : "The above prices are based on our Standard Conditions of sale, price policy and price data as shown in GE Handbook 4710, dated May 25, 1964." Six days later Ebasco placed its purchase order NY–668001 for the generator and turbines and accompanied that order with a letter of intent reading, in part: "A formal contract will be issued at a later date containing the terms and conditions of, and in the format of, the usual type of contract issued by Ebasco."

The GE standard terms and conditions differed textually from those of the Ebasco standard contract in such areas as warranties and remedies available to Ebasco (and therefore to its principal, PP&L), and negotiations continued between Ebasco and GE on these issues until December 1967. At that time an agreement, included in Supplement 16 to the contract, was reached on language governing warranties and remedies.[2] Supplement 16 was executed by GE

---

1. In a document entitled "PP&L's Preliminary Pre-Trial Statement, Exhibit B," PP&L specified 127 separate defects in the power plant, allegedly the responsibility of GE, Foster Wheeler, or Combustion. PP&L's claims against Foster Wheeler and Combustion were similar to those asserted against GE, though lesser in amount. They totalled approximately $12 million against Foster Wheeler and $4.5 million against Combustion.

2. Supplement 16 was drafted as one of a series of amendments to the Ebasco Purchase Order and Supplementary Terms and Conditions, which Ebasco had issued on July 21, 1964. The Supplement deleted the warranty provision of the Ebasco standard contract and replaced it with the following language:

The Seller warrants to the Purchaser and the Owner that the Equipment to be delivered hereunder will be free from defects in material, workmanship and title and will meet the specifications contained in the contract. The foregoing warranty is exclusive and in lieu of all other warranties whether written, oral or implied, including any warrant of merchantability or fitness for purpose.

This warranty for each item of Equipment shall be for one (1) year after the initial date of synchronization of the units into the system. The conditions of any test shall be mutually agreed upon, and the Seller shall be notified of, and may be represented at all tests that may be made.

and Ebasco on December 7, 1967. Significantly, GE began construction of the generator even while the negotiations were proceeding. Indeed, when Supplement 16 was executed in late 1967, that unit was already nearing completion and delivery.

The main points at issue on the partial summary judgment motion were:

1. Is the language of limitation contained in Supplement 16 sufficient to insulate GE both from PP&L's claims for cost of replacement power and lost profits and also from claims predicated upon alleged breach of implied warranty?

2. Is there a genuine issue of material fact on the question whether PP&L obtained contractual rights pursuant to § 2–207 of the Uniform Commercial Code (U.C.C.) by virtue of the GE quotation of July 15, 1964, the Ebasco purchase order of July 21, 1964, and the events occurring thereafter but before December 7, 1967, the date Supplement 16 was executed?

3. If the foregoing question is answered affirmatively, the question then arises as to whether Ebasco had authority to impair PP&L's § 2–207 rights by executing Supplement 16; i. e., is there a genuine issue of material fact as to whether PP&L is even bound by Supplement 16?

4. Is there a genuine issue of material fact on the question whether GE, through the negotiations resulting in Supplement 16, tortiously interfered with the contractual and/or fiduciary relationship between PP&L and Ebasco, and, if there is such a genuine issue of material fact, is there also a genuine issue of material fact on the question of GE's privilege to interfere?

We concluded in *Ebasco I* that Supplement 16 clearly excluded claims for replacement power, lost profits, and breach of implied warranties. However, we found that there were genuine issues of material fact: (1) on the question whether PP&L obtained contract rights pursuant to ˙U.C.C. § 2–207 by virtue of the GE quotation, the PP&L purchase order, and subsequent events; (2) on the question whether Ebasco possessed the authority to impair any such rights that may have existed—i. e., as to whether PP&L is bound by Supplement 16; and (3) on PP&L's tortious interference claim and on GE's defense of privilege thereto. The "bottom line" of the opinion, as it were, was that if Supplement 16 were valid, GE would have no liability for cost of replacement power. However, in the face of PP&L's claim that Supplement 16 was not binding, either because it was executed without authority or because it was improperly pro-

If the Equipment delivered hereunder does not meet the warranty specified above, assuming normal and proper use and maintenance, the Purchaser or the owner shall notify the Seller and make the Equipment available promptly for correction. The Seller shall thereupon correct any defect, including nonconformance with the specifications, at its expense, either, at its option, by repairing or replacing any defective or damaged parts of the Equipment.

The liability of the Seller to the Purchaser or the Owner under this warranty (except as to title) or for any loss or damage to the equipment whether the claim is based on contract or negligence shall not in any case exceed the cost of correcting defective or damaged parts as herein provided, and upon the expiration of said one year all such liability shall terminate. The foregoing shall constitute the exclusive remedy of the Purchaser and the sole liability of the Seller.

In addition, a new paragraph entitled "Limitation of Liability" was added to the contract. This paragraph provided:

Except as provided in the patent indemnity provision the Seller's liability on any claim of any kind, including negligence, for any loss or damage arising out of, connected with, or resulting from this contract, or from the performance or breach thereof, or from the manufacture, sale, delivery, resale, installation or technical direction of installation, startup or inspection repair operation or use of any equipment covered by or furnished under this contract shall in no case exceed the contract price of the turbine-generator unit or boiler feed pump turbine which gives rise to the claim and shall terminate six (6) years after the initial date of synchronization of the unit into the system. In no event, whether as a result of breach of contract, alleged negligence, or otherwise, shall the Seller be liable for damages for loss of use of power system, cost of capital, cost of purchased or replacement power, or claims of customers of Purchaser for severe interruptions resulting therefrom, or similar items of damage resulting therefrom.

cured, we determined that a trial would be necessary to adjudicate its validity.

We have referred thus far only to issues of contract formation and construction, agency, and tortious interference. The issues subsumed within the total litigation are, of course, far broader. Questions of performance or breach and negligence involve technical considerations, which presaged a trial of several months on the questions whether Ebasco and the equipment suppliers had in fact furnished defective equipment, had breached implied warranties, had breached the contract by delay in completion of the work, and/or had been guilty of negligence in the design or supervision of the installation of the various components of the power plant. Additionally, the damages questions are so involved that they would also take several months to try.

As we have suggested above, the vast bulk of PP&L's claims against all defendants is for cost of replacement power. As we noted in *Ebasco I,* in view of the enormous complexity of the litigation, it was apparent that ultimate trial time might be significantly reduced if Supplement 16 was determined at a separate trial to be valid and/or if the analog of Supplement 16 in the other equipment supply contracts for Brunner # 3 were held to exclude liability for cost of replacement power. We therefore decided to exercise our broad litigation management powers under Fed.R.Civ.P. 16 and try first only those issues that bore on Supplement 16's validity and on whether Ebasco, Combustion, and Foster Wheeler, under their contracts with PP&L, and GE under its contracts to supply equipment other than the steam turbine generator and boiler feed pump turbines, were contractually liable for the cost of replacement power.[3]

After a number of additional pretrial conferences, we framed the issues for initial trial as follows:

(1) What is cost of replacement power?

(2) Is the cost of replacement power recoverable by PP&L as an item of damage against the various defendants on PP&L's counterclaim, assuming arguendo that PP&L can establish liability against them?

We also formulated a crash discovery program limited to these issues. A jury having been waived, we listed the case for a bench trial to commence on June 14, 1976.

During the weeks before trial, intensive settlement negotiations developed among the parties. These negotiations resulted in the settlement of PP&L's claims against Ebasco, Combustion, and Foster Wheeler and of Ebasco's claims against PP&L. PP&L's case against GE remained open and proceeded to bench trial on the above two issues from June 14, 1976 to July 20, 1976. The voluminous record developed included thousands of pages of testimony and hundreds of documentary exhibits. After the conclusion of the trial, the parties submitted extensive requests for findings of fact and conclusions of law as well as lengthy post-trial memoranda, all followed by a number of reply memoranda. This opinion adjudicates the issues thus tried and briefed.

The vast bulk of this opinion addresses the issues surrounding the steam turbine generator contract (NY–668001) and Supplement 16 thereto. We will determine herein the validity of Supplement 16 and whether GE can be held liable for cost of replacement power on the turbine generator contract. We will also adjudicate the question whether GE can be held liable for such cost of replacement power as may be found to flow from GE's alleged breach of the other GE-Ebasco/PP&L equipment contracts for Brunner # 3.

We shall perforce begin with findings of fact. These findings will commence with certain background material relative to the parties, the steam turbine generator, PJM

---

**3.** Our next order of business after disposing of GE's major motion was to hear the motions for pretrial summary judgment of Combustion, Foster Wheeler, and GE (on its other contracts to supply equipment for Brunner # 3) asserting that they were not liable to PP&L for consequential damages, including cost of replacement power. We denied each of those motions from the bench, without opinion.

(the power interconnection), and the notion about which the parties are battling—the cost of replacement power. It is important to explicate what that notion is at the outset; understarding thereof is important to the legal issue of whether it is a direct or consequential damage. We shall then make findings about the dealings between GE and Ebasco relative to the steam turbine generator contract. Next, we shall address the question of trade custom and understanding circa 1964–67 relative to the imposition on power generation equipment suppliers of consequential damages, but particularly cost of replacement power. In the course of our findings we shall also consider the history of the GE-Ebasco course of dealing on various power plant contracts. These matters will illuminate the contractual undertakings of the parties. We shall then discuss the agency relationship between PP&L and Ebasco (for that subject bears upon Ebasco's authority to negotiate and accept Supplement 16) and then PP&L's reaction to Supplement 16 (which is relevant to the question of ratification). Lastly, we shall make findings on the question whether GE tortiously interfered with PP&L's contractual relations with Ebasco.

The chronicle that will emerge is in most respects mundane, as one might expect in a piece of commercial litigation. A fascinating aspect of this history, however, is the portrait that emerges of the contract formation process prevalent in the power generation industry in those halcyon days before litigation became the national sport. For, strange as it may seem, the custom in the trade was for electric utilities or their architect-engineer agents to agree to purchase tens of millions of dollars worth of equipment from GE, Westinghouse, or other power generation industry equipment suppliers, on only a handshake or sketchy preliminary document like a letter of intent, and on the faith of years of dealing together. The parties understood that in due course, a year or two or three or more— long after the machinery was in production or was completed, delivered, or even in operation—final documents would formally be executed. We note at the outset the existence of this languid modus operandi because it has important consequences for this litigation (it is responsible for the kinds of issues with which we must deal) and because it will facilitate understanding of the facts.

In the legal discussion which follows the findings of fact we will first take up the question of Ebasco's authority to issue Supplement 16. As will be seen, we find initially that Ebasco possessed implied, inherent, and apparent authority to issue Supplement 16. These conclusions, like most of the ultimate conclusions of this opinion, are a function of our findings of fact, principally those relating to: (1) the extremely broad powers vested in Ebasco by PP&L under their turnkey arrangement; (2) the extent to which PP&L held Ebasco out as having full authority to deal with all matters involving permanent project equipment even in the face of the dispute resolved by Supplement 16; and (3) trade custom and understanding. Moreover, because we find that Supplement 16 represented a negotiating trade off or *quid pro quo,* we also find that Ebasco possessed actual authority to issue it.

Our discussion will then proceed to a consideration of plaintiff's claim that GE tortiously interfered with the PP&L-Ebasco contractual relationship. That claim was based upon PP&L's contention that certain actions taken by GE (principally Cox's withholding of certain exhaust hood bolts from shipment to Brunner # 3) were designed to coerce Ebasco into accepting the provisions which became Supplement 16 not only in connection with Brunner # 3, but also in connection with all future turbine generator purchases made by Ebasco from GE on behalf of its many utility clients. Thus, in PP&L's submission, GE induced Ebasco to breach its fiduciary duty to PP&L, to PP&L's disadvantage. Again, our factual findings control. Crediting Mr. Cox's version of the exhaust hood bolts episode, (we find instead that he held up the bolts as leverage against Ebasco's refusal to pay for the boiler feed pump turbines), and finding

no other tortious conduct by GE, we reject PP&L's tortious interference claim.

The bulk of our discussion, however, will relate to the contract issues. In that discussion we conclude, inter alia, that: (1) there was no U.C.C. § 2–207 contract, on Ebasco terms or otherwise; and (2) the Ebasco standard terms themselves, when construed in the light of the Ebasco-GE course of dealing and the usage of the trade, limit PP&L's recovery for the most part to the cost of replacement and repair and do not permit recovery for cost of replacement power under any theory, i. e. contract, negligence, or strict liability.[4]

The "bottom line" of the foregoing is our finding that Supplement 16 is valid, insulating GE from PP&L's claims for cost of replacement power under the steam turbine generator contract, and further that GE is also insulated from liability for cost of replacement power on the other contracts that it had with Ebasco, even though those other contracts were made according to Ebasco's standard terms and were not covered by Supplement 16. We add that on the contract issues, just as on the authority and tortious interference issues, the result flows primarily from the facts developed at trial. This should not be surprising since *Ebasco I* suggested that the intent of the contracting parties needed illumination from such sources as course of dealing, trade custom and understanding, and the events involving Brunner # 3. Indeed, although *Ebasco I* focused in large measure on the tension between the July 15, 1964 GE quotation and the July 21, 1964 Ebasco letter of intent and purchase order, the record on which the case is now to be decided is infinitely more ample; we did not appreciate when we filed *Ebasco I* the extent to which the interstices would be augmented by a full trial record.

This opinion constitutes our findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

## II. Findings of Fact

### A. Background: The Parties; the Steam Turbine Generator; PJM; and "Cost of Replacement Power"

#### 1. The Parties to the Case

PP&L, headquartered in Allentown, Pennsylvania, is an investor-owned Pennsylvania public utility that provides electric power to large areas of northeastern and central Pennsylvania. This case concerns the third unit at PP&L's Brunner Island power plant, south of Harrisburg, Pennsylvania. Brunner # 3 was erected between 1965 and 1968 to augment PP&L's generating capacity. Ebasco, headquartered in New York, is a corporation engaged in designing and constructing power plants and acts in various capacities on behalf of its scores of utility clients throughout the world. Foster Wheeler and Combustion manufacture and sell components of power plants and supplied major equipment for Brunner # 3. GE is a New York corporation that, since 1900, has been engaged in the business of building and supplying to the electric power industry turbine generators and other equipment employed in the generation of electricity. GE is a large diversified corporation and is highly decentralized, with many independent and autonomous divisions.

#### 2. The Steam Turbine Generator

Although this lawsuit has involved a considerable number of the myriad components of a power plant, the piece of equipment that mainly concerns us is the steam turbine generator. A steam turbine generator is at the heart of any power plant. The turbine obtains steam, under pressures up

---

**4.** Our conclusions relate to the two applicable provisions of the Ebasco standard terms, Article 16 entitled "Guarantee" and Article 17 entitled "Delay." Article 17 provides that GE is liable for "general" damages for delay, but we also conclude that cost of replacement power is a consequential, not a general damage. We do, however, state one caveat: that our conclusion about Article 17 may be subject to revision if PP&L can demonstrate that exclusion of cost of replacement power thereunder would cause Article 17 to fail of its essential purpose, U.C.C. § 2–719(2).

to super-critical pressure of 3500 lbs per square inch, from either a coal- or oil-fired boiler or a nuclear steam supply system. The steam causes the turbine rotor and its blades (or "buckets") to rotate at very high speeds, often 3600 revolutions per minute. The energy thus created is transferred to the generator, which converts this energy to electricity. This electricity is passed, first through a transformer and then through transmission lines, to the electrical user.[5]

### 3. PJM and Cost of Replacement Power

The electric utilities throughout the eastern two-thirds of the United States and Canada are, with the exception of those in Texas, interconnected. Each utility is joined to its neighboring utility by electric transmission lines and generates electricity that flows over the transmission lines from one utility to the next throughout the country. Through these interconnections utilities can purchase or sell electricity as the situation warrants. By a series of transfers, electricity generated in the Midwest may supply the needs of consumers in Pennsylvania. The oldest and one of the most fully integrated interconnections in the United States is PJM (the Pennsylvania-New Jersey-Maryland Interconnection). Originally started in 1927 by three utilities, PJM is currently comprised of eleven utilities and operates as an integrated power pool. It serves an area that extends from northern New Jersey to Washington, D.C. and from the Atlantic Ocean to Lake Erie. There are six member utilities (including PP&L) and five associated utilities. The six member companies are signatories of the PJM agreement, which is the charter of PJM.

Interconnections such as PJM permit utilities to operate with enhanced reliability and greater economy. Each of the eleven inter-connected utilities in PJM generates a certain amount of electricity in order to supply the total customer demand in the PJM area at the least total cost. The electricity generated passes through free-flowing ties from utility to utility within PJM. Meters record this exchange of electricity between member utilities.

Every day of the year, PJM calculates the anticipated customer demand. It then directs the member companies to operate a sufficient number of generating units to meet that projected demand and also to provide an adequate available reserve. The reserve protects against the loss of a generating unit or inaccuracies in the prediction of customer demand. The most economical units on the interconnection are scheduled for operation, regardless of which utility owns the units.[6] During the day, PJM continuously monitors the customer demand and directs the eleven utilities to use their least expensive generating units to produce the energy to meet that demand. Customer demand follows a fairly regular daily pattern, which varies seasonally, and is predictably at its highest level at certain hours of the day. By means of the interconnection, the percent of generating capacity that any one utility must place in reserve is reduced. The diversity of the hour, day, week, and month of each interconnected utility's peak demand leads to substantial savings throughout the interconnection.

Because the cost of electric power varies with the cost of the fuel burned and the efficiency of a generating unit, it is different for each generating unit. Units with

5. The successful operation of a power plant depends not only on the boiler and turbine generator, but also hundreds of other smaller component parts and proper operation and maintenance by the utility. If any one of these components fails, or if operation or maintenance is improper, the power plant can be shut down. It can be very difficult in many instances to pinpoint the cause of failure. *See* discussion *infra*.

6. Constantly improving technology, with resulting economies of scale as newer and larger units are developed, has been a cornerstone of the electric power industry for decades. For instance, the two major items of equipment in any power plant—the steam generator (or "boiler") and the turbine generator—have been gradually increasing in rated performance. Utilities are, of course, interested in increasing the output of individual plants as a way of decreasing the cost of each kilowatt of electricity produced. Concomitantly, within any given electric power system there are more efficient and less efficient units.

the lowest costs are called "base-load" units, and are operated continuously in order to meet the basic customer demand most economically. As demand increases, the "peak-load" units with higher incremental costs must be brought into operation.

Since it began operation, Brunner # 3 has always been a base-load unit. Brunner # 3 therefore operates at or near the highest capacity of which it is capable whenever it is available for operation. When a base-load unit, or any unit, is unavailable to meet the customers' demand, the utility is required to replace that lost power generation. It accomplishes this replacement either by operating its own more expensive equipment or by purchasing power from a neighboring utility, whichever is less expensive.

The foregoing discussion illuminates the notion, central to this case, of "cost of replacement power." The cost of this replacement power is always higher than the power that is replaced. Because, during 1968–1970, Brunner # 3, a base-load unit, would always have been scheduled and operated at or near its rated capacity if available, but was unavailable to supply PP&L load demand for some portion of that period, PP&L had to purchase replacement power from PJM.[7]

The nature of "cost of replacement power" has a number of implications for this case. We note initially that because the PJM Interconnection is a fully integrated power pool to which PP&L and many other utilities belong, PP&L's sales or purchases of energy are dependent on and relative to the power supply and requirements of all the members of the PJM. In particular, Wilmer S. Kleinbach, the able manager of PJM, noted as follows during the course of his testimony:

There are too many variables to predict, with any reasonable degree of accuracy, the dollar cost of replacement power for a unit that is presently being planned to go into operation at a future date.

The principal factors affecting the cost of replacement power are within the exclusive control of the utility and include the installed cost of various units, operating costs, load forecasts, the size and type of units installed, the forced outage predictions and in-service date.

The cost of replacement power thus can only be determined retroactively, based on

---

7. There are three accounts that the PJ employs to calculate the cost of the replacement power purchased by a utility: Operating Capacity, Energy, and Installed Capacity.

If a utility does not have sufficient capacity in the operating units in its system to supply the customers' demand and provide an appropriate reserve, which is defined as "Operating Capacity," that utility must purchase Operating Capacity from an interconnected system. Similarly, if the energy being generated by a utility fails to satisfy the demands of its customers, that utility must purchase energy to meet the demand from an interconnected utility. Because PJM operates on the economically beneficial one-system concept with free-flowing ties, there are a substantial number of transactions among the companies. When a utility operates generating units that provide a capacity greater than the demands of that utility, that company provides operating capacity to the PJM, permitting another utility not to operate a more costly generating unit. The savings realized by operating the less expensive equipment is shared by the utilities within the PJM by using a split-savings principle—i. e., splitting the savings between the buyers and sellers. This account, the "Operating Capacity Account," is set forth in the PJM agreement.

There are many occasions when a utility provides electricity to satisfy the demands of another utility's customers; i. e., transactions that take advantage of one unit's ability to generate energy at a lower cost than another unit. These transfers of energy are measured by meters at the ties between the utilities, and are recorded in an "Energy Account" which is provided for in the PJM agreement. Again using the split-savings principle, the benefit of these transactions is shared by the members of the PJM.

A third account set forth in the PJM agreement is the "Installed Capacity Account." Each utility in the PJM is required to have sufficient capacity to meet a certain demand, measured by a formula in the PJM agreement that recognizes the utility's recent demand history. If a utility does not have sufficient capacity to meet that demand, the PJM agreement requires that the deficient company pay those companies that have excess capacity.

many factors that cannot be known in advance. For example, the cost of replacement power varies widely depending on the number of base-load units that are available and operating at any given time—and this very important variable cannot be known in advance.

An example of this complexity is shown by the testimony of PP&L's Vice President —Financial, Robert Fortune, who could not state at his deposition whether or not PP&L at that time had "excess capacity" (i. e., excess over what PP&L needs to serve its own customers). Mr. Fortune did not feel qualified to answer the question because "it involves a lot of considerations, both in the short-term/long-term liability in serving customers, economics of it. It is a very sophisticated judgment."

Mr. Fortune stated that PP&L did have a temporary excess reserve situation, which came about as a result of circumstances that were not planned for. He said that the reasons for this were rather involved and that it was difficult to pinpoint any one reason. It was partially due to the differential in fuel costs (PP&L had advantages because it was primarily a coal burning utility) and partially due to a reduction of growth resulting from conservation efforts as well as the recession. Mr. Fortune agreed that all of these factors are unforeseeable in terms of planning.

Moreover, the tremendous growth in demand for electric power (caused in part by PP&L's own marketing efforts) between 1964 (when the unit was ordered) and 1968–1970 (the period for which PP&L seeks damages) was, according to Mr. Kleinbach, so much greater than expected that it was "definitely not foreseeable." Indeed, the entire PJM Interconnection had insufficient base-load units in 1969–70 to meet the demand for power. This shortage increased the cost of power because relatively higher cost equipment had to be operated. In ad-

dition, the PJM experienced "slippage" (i. e., delay) in installed capacity and transmission capability. The PJM itself had forecast in the early 1960's a growth rate of 7 to 8 percent annually for the remainder of the 1960's, but the actual growth rate in 1968 was 13 percent. This greatly affected the cost of replacement power for PJM members.

In sum, the problematical nature of cost of replacement power contributes to our ultimate finding, see Part III.E.3. infra, that it is not a recoverable item of damage.

B. *The GE-Ebasco Dealings for the Brunner # 3 Steam Turbine Generator (The Facts Bearing on the UCC § 2–207 Issue)*

The steam turbine generator transaction began when, on July 14, 1964, Charles Bonin, a Vice-President of Ebasco, telephoned George B. Cox, then Marketing Manager of the GE Large Steam Turbine Generator Operations.[8] Bonin inquired whether GE was still offering turbine generators at a 22% discount off the list price. Bonin said that he was concerned because Westinghouse had just raised its turbine prices. Cox stated that GE was still offering the 22% discount, but refused to advise Bonin whether or when GE might raise prices. Cox also declined to accept an order, which Bonin tendered, because Bonin would not reveal the name of Ebasco's utility client. However, on July 15, 1964, Bonin again called Cox, disclosed the identity of Ebasco's client to be PP&L, and orally placed an order with Cox for one turbine generator, with an option for a second unit. Cox gave Bonin a price for these two units conditioned on the prevailing 22% discount off the GE Handbook price and stated that the price was based on standard GE Handbook terms and conditions, which, inter alia, specifically excluded consequential damages and limited GE's liability to repair or replacement of defective components.

8. The Large Steam Turbine Division, located in Schenectady, New York, makes large steam turbine generators. Cox is now General Manager for GE's Large Steam Turbine Generator Operations. GE also has a Medium Steam Turbine Division located in Fitchburg, Massachusetts (which fabricated the boiler feed pump turbines) and a Small Steam Turbine Division.

Cox testified that he felt strongly about conditioning the price on the basis of GE standard terms because GE was offering the unit at a price $600,000 lower than the Westinghouse quotation for a comparably sized unit. Bonin was obviously anxious to get the savings of $600,000 over Westinghouse's quote, and did not object to Mr. Cox's condition of GE terms.[9] This vast disparity between the Westinghouse and GE prices makes Cox's testimony that Bonin acceded to GE Handbook terms ring true. It is important to keep in mind that, although this case revolves around the parties' dispute as to what if any limitation of liability provisions inhere in the contract, we find that what was most important from Ebasco's perspective in July 1964 was price. It does not ring true to us that Mr. Bonin was about to fight the Battle of Bunker Hill, as it were, over which commercial terms and conditions (Ebasco's or GE's) would prevail when his prime concern—particularly in view of the turnkey arrangement—was price, for the price differential under a turnkey contract could not be passed on to PP&L. The best price (by some $600,000) was GE's. Furthermore, as will be seen, Ebasco did not then believe that suppliers such as GE could be held liable for consequential damages in any event, even under Ebasco's terms. It seems eminently reasonable to us that Mr. Bonin, fearful of an imminent GE price increase, would not object to Cox's reference to GE Handbook terms.

We thus find that the conversation between Cox and Bonin constituted a classical offer and acceptance and, therefore, that there was an agreement as of July 15, 1964 on the critical terms of the turbine generator contract—i. e. price and commercial terms and conditions—which, since GE conditioned its price on GE Handbook terms, included a specific exclusion of consequential damages. In the wake of subsequent developments, and for reasons that will appear infra, GE did not rely upon the Cox-Bonin agreement as the basis for its position. While extremely important, our finding as to what transpired during their conversation is but one of many bases of our ultimate conclusion. However, the finding would be an important one even if for no other reason than that it constitutes a rejection of the position advanced by PP&L that, during the conversation, Cox and Bonin agreed to a contract on Ebasco standard terms.

At the conclusion of the Cox-Bonin conversation, Bonin requested Cox to have a written confirmation delivered the same day, but in the form of a quotation rather than a confirmation. Accordingly, on July 15, 1964, T. J. Barron, of GE's New York Sales Office, delivered the written confirming quotation letter, as requested, to Bonin, "confirming George Cox's telephone conversation of July 15, 1964," stating the price for the turbine generator as quoted by Cox to Bonin, and noting that "[t]he above prices are based on our standard conditions of sale, price policy and price data, as shown in GE Handbook Section 4710 dated May 25, 1964." Styled a quotation, this letter was, in actuality, written confirmation of the Cox-Bonin agreement, which included GE standard terms.

Barron's letter described the first unit as a turbine generator set rated at 700,000 kw,

---

**9.** Bonin did not testify at the trial. He had testified at a deposition that he had no specific recollection of the conversation. Our findings are in accordance with Cox's testimony about the Cox-Bonin conversation, which we credit. In fact, we credit Mr. Cox's testimony in general. Although Cox was extensively and rigorously cross-examined (and his credibility roundly scored) by PP&L's extremely able counsel, Mr. Conrad, Cox's credibility emerged essentially intact. Notwithstanding the adverse outcome of the case for PP&L, we would be less than candid if we did not record—and this juncture is as appropriate as any—our observation that we have never presided over a case more awesomely prepared and presented or more brilliantly briefed on the facts and the law than was PP&L's case. The team headed by Mr. Conrad, consisting also of Mr. Baughman, Ms. Gellman, Mr. Marvin, and Mrs. Cohen, assisted by Ms. Gowen and her paralegal staff, receives from us our highest praise for what can be described only as quintessential lawyering. We have high praise too for GE's extremely able counsel, Mr. Reath, and his associate, Mr. Baylson, for their most competent and helpful presentation of the facts and law.

with standard accessories listed in certain pages of the GE Handbook. The net price for the first unit, noted to be 22% below GE's published price as of July 15, 1964, was set as $9,609,854. That price was not only stated to be firm for shipment within three years from the date of the order, but GE additionally agreed that if within six months it quoted to any purchaser a lower price for a steam turbine generator unit rated at 44,000 kw or larger for use within the United States, Ebasco's price would be reduced to that lower level. The quotation further afforded the purchaser the option to cancel the order without charge within 90 days. Finally, the quotation offered, subject to the same Handbook conditions, the same price terms for an order for boiler feed pump turbines.

The GE Handbook sections referred to by Cox orally (in general terms) and in Barron's quotation letter (specifically) contained a clause entitled "Limitation of Liability," which stated, *inter alia*, "In no event shall the company be liable for special or consequential damages," and also contained a "Warranty" clause which limited GE's liability "arising out of the supplying of the said equipment, or its use, whether on warranty, contract, or negligence . . [to] the cost of correcting defects . . .."

On July 21, 1964, Ebasco's purchasing agent, A. J. Salerno, wrote to GE, largely confirming Bonin's verbal commitment of July 15, 1964 to Cox. Salerno's letter included a technical description of the unit in greater detail than had Bonin's oral order, and recited also that superintendence of erection was included. Salerno's letter stated the total price and its derivation, rescribed the firm nature of the price, the price protection policy, and the option to cancel, set forth terms of payment, and noted that the time of delivery would be

mutually agreed upon. Salerno concluded, however, by adding that "a formal contract will be issued at a later date containing the terms and conditions of, and in the format of, the usual type of contract issued by Ebasco." The letter was signed "PP&L by Ebasco by A. J. Salerno, Purchasing Agent." [10]

There was nothing surprising about Salerno's reference to the later execution of a formal contract, for this was customary in the trade. Neither was it surprising that Salerno's letter referenced Ebasco's standard terms and conditions, for Salerno was a tough bargainer, *see* text accompanying note 18 *infra*, and the regular practice in the industry was for the contracting parties, over the ensuing years, to hammer out the details of the final contract. We find that the parties expected that to happen here.

GE did not take prompt exception to Salerno's reference to Ebasco's standard terms. Indeed, it was not until May 4, 1967, almost three years later, that GE gave formal written notice to Ebasco that GE objected to the use of the Ebasco terms and conditions on Brunner # 3. Notwithstanding this delay, we reject PP&L's contention, the veritable cornerstone of its position in the case, that Ebasco and GE believed that they had a contract on Ebasco's terms and conditions after the Salerno July 21, 1964 letter—or at any time thereafter up to and including the critical November 1967 negotiations from which Supplement 16 emerged. We also reject the concomitant cornerstone of PP&L's position, that there was an *integrated* contract on Ebasco's standard terms.

We will describe, *see* Part II.D. *infra*, the GE in-house response to Salerno's letter and the extent of oral communication from GE to Ebasco on the point.[11] However, we believe it preferable to first recount signifi-

---

**10.** On the same day, Bonin wrote to Douglas G. Connell, a Vice-President of PP&L, confirming that Ebasco had obtained quotations from both GE and Westinghouse for the 700 MW steam turbine generators, that GE's price was $722,344 per unit lower, and that, with PP&L's approval, Ebasco had placed the order with GE.

Bonin enclosed copies of GE's quotation letter and Ebasco's letter to GE.

**11.** We find, *see* Part II.D. *infra*, that there was communication by GE's Davis of GE's objection as early as 1964.

cant contacts between GE and Ebasco relative to Brunner # 3.

On September 16, 1964, Salerno wrote to R. B. Davis of GE's Electric Utility Sales Division confirming an order for boiler feed pump turbines for the steam turbine generator units previously ordered. Salerno's letter referenced standard Ebasco terms. On October 14, 1964, Salerno wrote to GE, reserving the option until December 1, 1964 to cancel the entire order at no cost to PP&L, again referencing Ebasco terms. By letter dated March 5, 1965, Salerno wrote to Davis fully releasing the turbine generator for design and production pursuant to certain general and basic specifications which Salerno proceeded to detail. Salerno further wrote that "shipment shall be scheduled for June 1967" and requested that GE submit a complete schedule covering all of the drawings to be submitted for review.[12] On April 20, 1965, in response thereto, Barron of GE wrote to Ebasco advising that the rating of the unit, as firmed up, was different from the GE quotation of July 15, 1964, and stating the technical revisions and revised price ($9,614,184.00). The letter added, however, that the stated prices were based on GE's standard conditions of sale, price policy, and price data as shown in the GE Handbook § 4715, dated May 25, 1964. The letter was sent on GE's "quotation stationery," which on the back stated, inter alia : "In no event shall the company be liable for special or consequential damages." Ebasco did not respond to the letter. On June 14, 1965, on similarly referenced quotation stationery, Barron wrote to Ebasco giving, based on a revised heat rating, further revisions to prices.

As the foregoing suggests, there had been intensive consultations between GE and Ebasco Engineers between July 1964 and June 1965 concerning technical and contract details. After receipt of Salerno's March 5, 1965 letter, GE commenced the process of fabricating the turbine genera-

tor. The manufacturing process was not without incident, because of a lengthy strike at the GE Schenectady works, where the large steam turbine generator operations are housed. In January 1967, GE advised PP&L that, because of the strike, the shipment of the Brunner # 3 turbine generator would be delayed from June 1967 to October 1967. The technical discussions continued. The contract discussions also continued off and on, but it was not until March 1966 that Ebasco sent GE a proposed final contract.[13] As we have noted, in May 1967 GE memorialized its objections to Ebasco's proposed purchase contract. It did so by a twelve page letter from Paul Pendzick of the Electric Utility Sales Division to W. P. Johnston of Ebasco. Pendzick's letter principally raised issues about the superintendence of erection, patents, seller's warranty, delivery, and limitation of liability clauses.

Ebasco, as a major engineer/constructor in the electric power industry, frequently dealt with GE in connection with the purchase of power plant equipment. Thus, in view of the ongoing contact between the two companies, there had been intermittent general discussions between GE and Ebasco about commercial terms even aside from Brunner # 3. Indeed, these discussions had been going on for many years. See Part II.C. infra. For instance, there had been a meeting in 1960 on the subject. The matter was again discussed by GE personnel in December 1965 with Mr. Colquhoun, Ebasco's chairman, and later with Salerno and Chase of Ebasco. On February 10, 1966, Arthur Strang, counsel to GE's Large Steam Turbine Division, met with Charles Read of Reid & Priest, Ebasco's outside counsel. In these meetings, GE attempted to obtain tighter language of insulation against consequential damages in the event of power plant component failure.

During the summer of 1967, as the steam turbine generator approached completion,

---

**12.** The letter was drafted for Salerno's signature by William Y. Stolz, Salerno's assistant, who gave extensive testimony at trial. Unfortunately, Mr. Salerno died before the trial.

**13.** It was also in March 1966 that Ebasco and PP&L finalized their contractual arrangement.

the negotiations over the final contract began to heat up. On August 15, 1967, Davis reported back to Schenectady that Ebasco had refused GE's May 4, 1967 exceptions to Ebasco's purchase order. In late August, GE began arranging for a contract meeting with Ebasco on Brunner # 3, but wanted to wait until Strang returned from Italy. Although PP&L disputes this, we find that Salerno was willing to delay the contract meeting, believing that delay gave Ebasco greater bargaining leverage. Salerno felt that his hand was strengthened because the steam turbine generator was nearing completion and was being readied for shipment; with no final contract having been signed, GE faced the possibility of having a steam turbine generator on its hands, which represented a potentially catastrophic business loss.

Also, by this time the boiler feed pump turbines had been delivered but had not been paid for because Ebasco had a policy of not paying suppliers on equipment in the absence of a signed contract. There is a serious dispute between the parties as to whether payment was due in October 1967 for the boiler feed pump turbines. We accept Ebasco's position that it did not believe payment was due. Likewise, we accept GE's submission that it believed that payment was due. On the basis of the record, we believe both that the dispute was an honest one and that GE's position was reasonable. However, when Ebasco persisted in its position and did not pay for the boiler feed pump turbines, Cox held up from shipment certain bolts for the turbine exhaust hoods until Salerno agreed to pay for them (and, as will be seen, also agreed to abandon his threat not to pay for the main unit when it was shipped). The question of Cox's true motivation for holding up shipment of the bolts is central to PP&L's tortious interference claim. *See* Part II.G. *infra.*

Amidst this "tug of war" atmosphere, a meeting was held in Ebasco's New York City offices on October 26, 1967. Cox, assisted by Strang, Davis, Pendzick, and Benjamin Monk, represented GE; Salerno, assisted by Stolz, represented Ebasco. The principal topics discussed were: (1) whether GE's responsibility would be superintendence of erection" vs. "technical direction of installation"; (2) the warranty and delay articles; and (3) the limitation of liability clause. It was out of this meeting that a consensus leading to Supplement 16 ultimately emerged via follow-up discussions. The dialogue and consensus of the meeting on the three major points went somewhat as follows.

### Technical Direction of Installation vs. Superintendence of Erection

Ebasco sought to maintain the section of its proposed contract entitled "Superintendence of Erection," but agreed to substitute the GE proposals called "Technical Direction of Installation." Ebasco was satisfied that the latter was merely a clarification of GE's duties at the site, and would not result in any change in actual responsibility. GE had offered to include Ebasco's "Superintendence of Erection" clauses in the final contract for a price of $.50 per $100.00 of the contract amount, but PP&L was unwilling to pay the price adder.

### The Warranty Clause

On the warranty clause, GE made certain concessions, and Ebasco secured corresponding benefits for PP&L as regards both an extended warranty period and a broadened warranty scope. In the "warranty" paragraph, GE insisted on the scope of the GE Handbook warranty but agreed to extend the term of that warranty, which ran one year from completion of installation. This represented an extension of the warranty over both the GE Handbook and the Ebasco form, and was thus of benefit to PP&L. Moreover, under the warranty paragraph which was agreed upon in Supplement 16, there was a further advantage gained by PP&L and Ebasco because the limitation of liability under the warranty clause applied only to claims *under the warranty*. This represented a somewhat narrower limitation of liability than the GE Handbook, under which the limitation to the cost of

correcting defects pertained to GE liability *"arising out of* the supplying of the said equipment *or its use."*

## Limitation of Liability

Two facets of the limitation of liability problem were discussed at the October 26 meeting. Part of the discussion concerned the dollar amount of potential GE liability. GE insisted on a limitation to the price of the "part" of the unit which gave rise to any cause of action. Ebasco, on the other hand, sought a higher limit, such as the price of the turbine generator itself. GE ultimately agreed to increase its limit of liability for defects from the value of the defective part to the contract price of the entire unit (approximately $10,000,000), and to extend the termination date of any liability under the contract from 4 to 6 years.[14]

The other facet of limitation of liability discussed at the meeting related to GE's potential liability for consequential damages, such as cost of replacement power. Throughout the meeting, GE insisted on contract language that specifically and unequivocally excluded liability for such matters. Ebasco ultimately agreed to terms that specifically defined the types of damages for which GE would not be liable (believing this preferable for PP&L to a

general exclusion of "consequential damages"). Neither during the meeting of October 1967 nor in subsequent telephone conversations or correspondence did Ebasco suggest that the contractual undertakings of the parties imposed consequential damages (or the cost of replacement power) as a potential liability on GE. In Supplement 16, the parties agreed that:

> In no event, whether as a result of breach of contract, alleged negligence, or otherwise, shall the Seller be liable for damages for loss of profits or revenue resulting therefrom, or for damages for loss of use of power system, cost of capital, cost of purchased or replacement power, or claims of customers of Purchaser for service interruptions resulting therefrom, or similar items of damages resulting therefrom.

As part of the discussions, GE offered, for a dollar adder of 3% of the contract price, to omit from the contract any language containing a limitation of liability; this proposal was in due course rejected. The purpose of the 3% adder was, in Mr. Cox's view, to insure against the cost of a lawsuit and not to include liability for cost of replacement power. The etiology of this position and of Ebasco's consent to the clear exclusion of various forms of consequential

14. Following up on the conference, Strang suggested in his letter of November 3, 1967 a dollar limitation that GE liability "shall in no case exceed the price allocable to the specific equipment or unit which gives rise to the claim and would terminate four years after completion of installation." GE wanted the four-year limitation to avoid stale claims and because GE was increasing its potential liability over the GE Handbook, which limited liability to the price of the specific "part" that gave rise to a claim. On November 10, 1967, Strang and Cox called Stolz. They also wrote to Salerno confirming the Stolz conversation and enclosing a copy of various proposed sections of the turbine generator contract.

In connection with the proposed "limitation of liability" clause, Strang commented:

> In response to your request, we have tried to make it clear that the limit of our liability would in no case exceed the contract price of the turbine generator unit or the boiler feed pump turbine which gives rise to the claim. However, because of the substantially increased burdens assumed by the company

under this clause, we believe that except as provided in the patent indemnity provision that all other liability should terminate four years after completion of installation.

Although PP&L describes it as "illusory" and as eradicated by other parts of Supplement 16, we find that the language agreed to constituted an extension of GE liability over and above Ebasco terms (as well as over the GE Handbook). Ebasco terms, by their language, limited supplier liability to the cost of repair or replacement of a defective part.

By letter dated November 17, 1967, Strang wrote to Salerno confirming a telephone conversation between them on November 16, 1967 in which they agreed upon the final form of the warranty, indemnity, and limitation of liability provisions for the turbine generator contract. Strang enclosed a copy of his understanding as to the agreed upon language. However, as a result of further efforts by Ebasco to increase GE's exposure to liability from the previous draft dated November 10, 1967, GE agreed that the termination date of any liability would be extended from four to six years.

damages requires that we recount some historical background.

Ebasco had for many years been of the view that suppliers were not liable for consequential damages, including cost of replacement power. *See* Part II.C. *infra.* Nevertheless, Ebasco had resisted changing its own standard terms and conditions to make that view explicit.[15]

GE, needless to say, agreed with Ebasco's understanding. However, GE continued to seek language more explicit than Ebasco's. This had become a matter of more concern as the 1960's developed because of the sporadic surfacing of claims for cost of replacement power. The concern was exacerbated by the potential magnitude of such claims as presaged by the famous November 1965 Northeastern U.S. power blackout. Indeed, on January 21, 1966, GE had issued a marketing information letter on the subject, announcing that thereafter all relevant handbook sections (including § 4710, involved here) would contain a statement that "every quotation and contract will include a provision expressly negating any liability for special or consequential damages."[16] The letter explained to GE's customers the basis of its position:

> For example, if a utility suffered a forced outage due to failure of equipment, it may well incur extra expense in purchasing replacement power or in operating older, less efficient equipment of its own.

The Northeast blackout has underscored the potential liability which a supplier might have if such an occurrence could be traced to failure of equipment.

One of the problems in assessing the risk is that the potential liability has little relationship to the nature of the failure. It is much more heavily influenced by the system characteristics. For example, a failure at time of peak load would be more costly than the same occurrence off peak.

Most utilities agree that manufacturers should not be expected to take this risk since they do not have any direct control of the magnitude of expense. Since manufacturers cannot predict or control the costs of consequential damages, the inevitable result of taking such risk would be higher prices for turbine-generators.

Utilities can reduce and control their own expense by arranging interconnections with other utilities, self insurance, adequate preventive maintenance or by purchasing "extra expense" insurance which not only protects against losses due to equipment failure but against failures due to operator error or even natural causes such as lightning.

**15.** Ebasco theretofore had stood on Paragraph 16 of its (Standard) Supplementary Terms and Conditions:

16. GUARANTEE

The Seller warrants to the Purchaser and the Owner that all Equipment furnished under this Order shall be free from defects either in design, material or workmanship and shall be suited in all respects both for the purposes for which it is specified hereunder to be sold and for all other uses for which it may be represented in writing by the Seller to be suited. The Seller also warrants to the Purchaser and the Owner the successful operation of all such Equipment. The Seller shall not be required to correct any defects which may appear in such Equipment after one year from the date it is first put into service, such service to begin within a reasonable time after the delivery of such Equipment. Except to the extent hereinafter in this paragraph otherwise provided, the Seller's liability under this Article No. 16 shall in no case (except as to implied warranty of title) exceed the cost of repairing, or of supplying a replacement for, any defective parts or material. If the Equipment furnished under this Order is installed by the Seller and any defect or defects in design, material or workmanship appears within the period of time in this paragraph above set forth, then, in addition to repairing, or furnishing a replacement for, any defective parts or materials, the Seller shall negotiate with the Purchaser and/or the Owner as to the extent of the additional burden or responsibility, if any, that Seller shall assume in completely and satisfactorily correcting any such defect or defects. . . .

**16.** Special or consequential damages were defined in the letter to include "such items as loss of profits or revenue, loss of use of power system, cost of capital, cost of purchased or replacement power, or claims of customers of Purchaser for service interruptions."

\*    \*    \*    \*    \*    \*

Adding to the seriousness of this situation are the recent instances of insurance companies suing for consequential damages on machine⌐ which had been in service seven, four, and two years. In these three cases the utility, after a failure, has collected from the insurance company who, in turn, had sued us either directly or in the customer's name. This is a particularly difficult situation because we must involve the utility in the suit. We have always felt that our relationships with our customers were such that we could settle our differences amicably— but, when an insurance company is involved, it is not concerned with the long-term relationships between the customer and ourselves.

For all these reasons we must have protection against claims of this nature. This must be in the contract to protect us against claims by the customer's insurance company or customer himself if he has no insurance.

The marketing information letter stated that GE would charge a 3% adder to the total price to any customer who would not give GE protection against special or consequential damages. The letter continued:

The three percent adder is to cover the possibility of our additional risk during the normal warranty period, but in no way does this imply that we will be liable for consequential damages.

PP&L has argued that GE's and Cox's position on these points is preposterous. With all respect, we disagree. We find nothing surprising about GE's efforts to obtain airtight limitation provisions notwithstanding general trade understanding, detailed in Part II.C. *infra*, that under Ebasco's or other engineer/constructor's standard provisions the supplier was not liable for cost of replacement power. Lawyers know that making explicit terms that would otherwise only be implicit is what lawyers always try to do, and would especially want to do given the escalating cost of litigation of the type in which cost of replacement power might be claimed. (Nor, of course, is it surprising that Ebasco resisted changing its terms; it was comfortable with them.) We do not perceive that Cox viewed potential liability for cost of replacement power as a substantial risk at the time, hence we do not find disingenuous Cox's statement that 3% adder represented the cost of defending a lawsuit. Indeed, we suspect that GE's legal fees to date in this case represent a substantial portion of that sum.

The role of the limitation clause in the events leading to Supplement 16 is critical to our disposition of this case, for the gravamen of PP&L's tortious interference claim is its contention that the reason Cox held up shipment of the exhaust hood bolts was to pressure Ebasco into yielding to GE's demands for a clause clearly exonerating GE from claims for cost of replacement power, not only for purposes of the Brunner # 3 contract but also as a prototype for all contracts for equipment purchases to be made from GE by Ebasco on behalf of its many utility clients. PP&L's documentation of this conspiratorial theory was painstaking and its presentation of the theory was impressive.[17] We found it, however, to

---

17. And we do accept the bulk of PP&L's requested findings of fact Nos. 113 and 114, agreeing that:

  (a) Cox in fact stored the bolts in his own office;

  (b) He did not tell Mr. Coutant, the Manager of Materials, who was in charge of scheduling all parts for shipments, about the withholding;

  (c) He did not tell Mr. McLane, who was in charge of all expediting on the Brunner # 3 turbine, about the withholding, and for several days Mr. McLane attempted to get the bolts shipped before his boss told him to stop "beating your head."

  (d) Mr. Hingston, the GE Service Manager, who was in charge of coordinating with Ebasco and PP&L at Brunner Island # 3, was not told about the intentional withholding, despite his repeated requests for shipment of the bolts, until 1969; and

  (e) Cox carefully considered which turbine parts to withhold and decided upon the bolts because he knew that they could be shipped quickly.

The critical question, however, is Cox's motive for withholding the bolts, not the fact that they were withheld.

be unconvincing. For as we see it, the role of the limitation of liability clause paled in comparison with the bread-and-butter economic issues confronting Mr. Cox. We credit the testimony of both the GE witnesses and Ebasco's Stolz that Salerno was an extremely tough negotiator, and that he was desirous of delaying final contractual negotiations in the belief that brinkmanship gave Ebasco more leverage. We also credit the testimony that Salerno was holding back payment on the boiler feed pump turbines and threatened not to pay for the steam turbine generator until a contract— which seemed elusive at the time—was signed.[18] This meant that GE would have to wait for, or litigate over, huge sums, the delay in payment of which would doubtless affect the turbine operations dollar performance figures about which Cox, as Marketing Manager, was concerned (and for which he may have been responsible). We believe that the leverage exerted by Cox in holding up shipment of the exhaust hood bolts was directed toward the basic matter of current payments, not the more speculative matter of doubtful—though potential —liability.

As we have noted, Supplement 16 emerged from the aftermath of the October 26 meeting (there were subsequent calls and letters, firming it up). Ebasco issued Supplement 16 to GE on November 30, 1967 and the entire contract, with Supplements 1–16, was signed by GE on December 7, 1967.[19] In due course the steam turbine generator was shipped, installed, and synchronized with the rest of the plant.[20]

Before turning to the next segment of our findings of fact, which deals with the Ebasco-GE course of dealing and with trade custom and understanding circa 1964–67 relative to the imposition of consequential damages upon power generation industry equipment suppliers, which segment fills some interstices in our previous findings, we feel constrained to rescribe, in the light of our description of the prelude to and substance of the October 26 meeting, our finding that Ebasco did not believe as it entered the meeting that a contract existed on Ebasco standard terms or that there was an integrated contract. In view of our finding about the Cox-Bonin conversation, it was GE that had the right to believe that there was a contract on GE's terms. PP&L has argued that nothing better demonstrates the absence of such a contract than GE's failure to rely upon it in this litigation. That argument is not without force, though we have rejected it.[21] The point, however, is that whatever the threshold understanding may have been in the industry at that time, the parties expected a lot of give and take—on both contractual and technical terms—before reaching a final agreement.

The parties' conduct tracked these expectations; rather than assert reliance on existing contract rights or on legally constructed contract rights á la U.C.C. § 2–207, which neither party ever thought of, much less believed existed, the parties went to the

18. The testimony was that Salerno was a volatile as well as tough negotiator. At the October 26 meeting he in essence told Cox to take Ebasco's terms "or else" and he said that although the turbine generator was near completion he would not pay without a formal, signed contract.

19. Supplement 17 was issued on December 13, 1967, to make certain typographical changes in Supplement 16.

20. Synchronization occurred on December 17, 1968. Commercial operation began in 1969. Other divisions of GE including the AC Motor Division and the Power Transformer Division supplied auxiliary equipment to Brunner # 3 under Contracts # NY–668006, NY–668007, NY–668008, and NY–668009. This equipment included motors, switchgear equipment, and transformers. These other GE divisions had agreed to the commercial terms proposed by Ebasco in its purchase order—the so-called Ebasco "standard terms"—and there was no equivalent to Supplement 16 in these contracts.

21. As we see it, GE did not take a trenchant stand in defense of its Handbook terms because they were not, in light of trade custom and understanding, that far different from Ebasco's terms (though concededly they left less room for buyer's argument about seller's liability). We also find Ebasco's pre-October 26, 1967 contention that there was a contract on Ebasco's terms to have been a bargaining ploy.

negotiating table and "hammered out" a deal. In this regard, we also note our finding that PP&L's estimate of the situation was similar to that of Ebasco; PP&L neither believed nor had reason to believe that there was an integrated contract on Ebasco's terms. Concomitantly, PP&L (acting principally through Mr. Baum) also knew that the final contract was yet to come. Indeed, Mr. Busby, PP&L's President, testified that there customarily was a long lag in working out contractual details.

C. *Trade Custom and Understanding Circa 1964–67 Relative to the Imposition Upon Power Generation Equipment Suppliers of Cost of Replacement Power as a Recoverable Item of Damages (And the GE-Ebasco Course of Dealing)*

We find that in the power generation industry, there was, as of the period 1964–67, a long-standing custom and usage, recognized and accepted by all concerned parties, that manufacturers or suppliers of equipment warranted that their equipment would be free of defects in design, manufacture and operation; that the equipment would meet designated specifications; and that the limit of the supplier's liability would be to repair or replace defects at its expense. Put differently, under the traditional custom and usage, manufacturers or suppliers were understood not to be liable for any form of consequential damages—more specifically, for loss of profits or cost of replacement power—as applied to all legal theories of recovery.[22]

The standard Ebasco terms and conditions about which we have spoken mesh with this industry expectation. Ebasco's

terms provided that the seller's liability shall "in no case" exceed the cost of repair or replacement. Roger F. Sherman, the President of Ebasco, testified that it was Ebasco's understanding under its standard terms and conditions that suppliers were not to be liable for cost of replacement power. In response to our questioning, Mr. Sherman also testified that, in general terms, the custom in the trade was that suppliers were not liable for replacement power and that the documents that were current in the trade gave them that protection. We credit that testimony.

■ Harold E. Kennedy, general counsel of Foster Wheeler, dealt frequently with Ebasco on power plant purchases. During the pendency of Foster Wheeler's dealings with Ebasco on Brunner # 3, Kennedy, á la GE, spoke with Salerno and observed that since Ebasco's general terms and conditions did not in so many words exclude liability for consequential damages he would feel more comfortable if the language was more specific. According to Kennedy:

Mr. Salerno stated that the general terms and conditions that Ebasco used while they were perhaps ambiguous nevertheless had acquired a very definite meaning among all suppliers and customers of Ebasco. And he suggested to me that perhaps in pursuing the idea of writing some kind of new agreement, I would be putting Foster Wheeler in a poorer position than we were using terms and conditions that everyone in the industry knew exactly what they meant. . . . Mr. Salerno says that provisions of their general terms and conditions were not intended to impose liability for consequen-

---

**22.** We are somewhat self-conscious about the wording of the text at this point, since PP&L might suggest that we have "put the rabbit in the hat" by referring to cost of replacement power as a consequential (or special)—as opposed to general—damage. PP&L has argued forcefully that cost of replacement power is a general damage which flows naturally and proximately from the breach at issue. We have ultimately concluded that cost of replacement power is a matter of special or consequential damage, the recovery of which is pre-

cluded by the agreement of the parties. *See* Part III.E.2(A) *infra*. We have not done so by an ipse dixit, however, but by analysis of the notion of cost of replacement power against the background of the applicable law. However, the present segment of the opinion, which explains the understanding of the parties as to the *obligations of suppliers to pay cost of replacement power in the event of equipment failure,* does contribute to our conclusion as to the special or consequential nature of cost of replacement power as an item of damage.

tial damages of any nature or suppliers to Ebasco or its customers.[23]

Kennedy also reported, in a November 13, 1963 inter-office memo, circulated after talking to Stolz regarding Article 17 ("Delay") of Ebasco's standard terms, that Article 17's intent was not to include liability for consequential damages either. Additionally, in 1964 William Stevens, Foster Wheeler's Executive Vice-President, discussed Ebasco terms with Frank Ritchings, Ebasco's Chief Consulting Engineer, in connection with a boiler that Foster Wheeler sold to Texas Power & Light. Mr. Ritchings assured Mr. Stevens that Ebasco terms did not include liability for consequential damages, and that Foster Wheeler's responsibility was limited to repair and replace-

ment. Mr. Stolz also conceded that from 1960 to 1968 Ebasco had never attempted to hold suppliers liable to it or its utility client for consequential damages.

The dialogue between GE and Ebasco over standard contract terms did not begin with Brunner # 3. Ebasco had numerous utility clients and had been dealing with GE on equipment purchases for many years. Ebasco had made clear to GE at various times during their ongoing relationship that Ebasco and its utility clients did not interpret Ebasco's language to impose liability for consequential damages, such as the cost of replacement power, on GE.

There was much testimony at trial about developments on this front in 1960. By letter dated April 5, 1960, GE's Davis wrote

---

**23.** Mr. Conrad moved to strike Mr. Kennedy's testimony as hearsay (Fed.R.Evid. 801), but we believe it to have been properly admitted under Fed.R.Evid. 803(3) as a statement of the declarant's intent, plan, motive, or design. Further, the declarant (Salerno) was unavailable at the time of trial (due to his death) and, were it not for the restrictive reading of the statement-against-interest rule (codified in Fed.R.Evid. 804(b)(3)) adopted by most courts, we would not hesitate to find the statement admissible under that rule as well. Salerno's declaration was certainly contrary to the interest of his employer, and he was one of Ebasco's most important employees. Although the rule is said to require that the declaration be against the personal financial interest of the declarant, we perceive no less circumstantial guarantees of trustworthiness (the touchstone of the exceptions to the hearsay rule) where a high corporate employee makes the statement on behalf of the corporation.

In *Timber Access Industries Co. v. U. S. Plywood-Champion Papers, Inc.*, 263 Or. 509, 519–521, 503 P.2d 482, 487–488 (1972), buyer's manager admitted, contrary to his employer's pecuniary interest, ordering certain logs. The Oregon Supreme Court, conceding that the statement was not against the declarant's pecuniary interest and so was not strictly within the declaration-against-interest exception to the hearsay rule, nevertheless was of the opinion that the manager was in a position to have knowledge of the facts and that a person in his position normally would not have made the statement unless it was the truth.

The Court stated:

In the present situation, Girard's purported statement concerning the conditions under which the logs were purchased does not fit nicely under any of the generally recognized exceptions to the hearsay rule. However, if

the words were spoken, there is an aura of trustworthiness about them which makes evidence of them admissible. A manager of a plywood plant gets to be manager because of his employer's confidence in his business acumen. His ability to buy logs advantageously in a widely fluctuating market is one of the reasons he holds his position. If he admits that he obligated his employer to buy unconditionally a volume of logs at a set price without a definite deadline, he is admitting that he made a disadvantageous deal and this would necessarily reflect adversely upon his ability. It is not natural, normal, or usual for a person to admit that he made what has turned out to be a poor deal unless, in fact, he did make it. Testimony concerning his statement should be an exception to the hearsay rule, not because he was acting as the agent of his employer at the time he made the statement; not because it was proof of a mental state or condition; not because it was an admission against his pecuniary interest; but because he was in a position to have knowledge of the facts, and a person in his position normally would not have made the statement unless it was the truth. The declarant's interest, although not pecuniary, was sufficient to assure that he was not lying and that the statement was not the result of any mistake of fact.

503 P.2d at 487. The court held the statement admissible. Although we do not formally embrace its holding, we note our belief that the Oregon Court has announced a salutary rule of law, one that is consistent with the spirit and the letter of the Federal Rules of Evidence. *Cf.* Fed.R.Evid. 804(b)(5).

In view of our ruling, we need not reach the argument that the testimony was not hearsay because it was offered for a non-hearsay purpose.

to R. B. Chase, Ebasco's general purchasing agent and Salerno's predecessor, commenting on the "Delay" clause section of Ebasco's Appendix A. This clause stated in part:

Seller shall be held responsible for any damages of a general nature which the purchaser may incur due to any delay in delivery or in the completion of the work hereunder as a result of causes within the seller's reasonable control.

Davis wrote that GE had an understanding that the damages of a "general" nature did not include damages for loss of profits or revenue resulting from failure to make delivery as specified or damages resulting from the loss of its power system or the cost of purchase of replacement power or apparatus. By letter dated May 25, 1960, Chase replied to Davis and stated that Ebasco was "not in accord with the contents of your above mentioned letter, and we cannot agree to accept the provisions as you spell them out. Therefore, it would be our suggestion that you call the writer at your earliest convenience so that we can make arrangements to more fully discuss the entire situation with the idea of coming to a better understanding as to both of our requirements in respect to the matter."

Sometime between the receipt of this letter and June 10, 1960, Davis had a conversation with Chase, who advised Davis that "the present wording of Appendix A adequately covered GE with regard to consequential damages." Chase asked Davis if a change in the "delay" clause of Appendix A would straighten out the problem, and proposed changing the word "general" in the first sentence to "direct." Davis suggested to Woods McCahill, Esquire, GE's counsel for Electric Utility Sales, that a meeting between McCahill and Ebasco lawyers was called for. McCahill agreed.

The meeting envisioned by these communications took place on December 13, 1960 and was reported in a memorandum from McCahill to J. W. Dodge of GE, dated December 19, 1960. Davis and McCahill represented GE at the meeting, while Chase and Edward Wells of the law firm of Reid &

Priest represented Ebasco. Chase was unwilling to make changes in the forms, because

. . . a change of this nature with their twenty to twenty-five clients would be quite cumbersome, and . . . each of the clients had very definite ideas of what should be in the terms of purchase.

However, Chase did state that all utility clients [of Ebasco] "were in agreement on the fact that consequential damages should not be claimed against manufacturers." Additionally, Chase stated that, in the event of late delivery by a supplier, Ebasco interpreted Appendix A to mean that "no claim could be made for loss of profit, cost of purchased power or claims by customers for service interruptions."

McCahill sent copies of his memorandum of the meeting with Chase to Strang, as well as to Messrs. Davis and Warner (GE sales representatives in New York City) in order to record in the GE files Ebasco's expressed interpretation of its terms. That Ebasco would not have disagreed with this practice of documenting negotiations is reflected in McCahill's memorandum, which states that Ebasco had pointed out that the language of Ebasco's present forms had come out of GE's recommendations in 1947 negotiations and that Wells said that if any questions ever came up "presumably the background of the negotiations of 1947 would be admitted into evidence to explain what the parties meant by the present language."

There was also other testimony from other knowledgable executives in the power generation industry to the effect that Ebasco's understanding accurately reflected the understanding and custom in the trade. We credit that testimony. Indeed, the record reflects that PP&L itself shared that understanding.

The deposition testimony of PP&L Vice-President Douglas Connell was introduced at trial. Mr. Connell testified that he did not believe that the customary warranty in the industry imposed the cost of replacement power on suppliers. Mr. Connell also

described as accurate the statement in the letter of PP&L's counsel, Mr. Crago, to the Pennsylvania Public Utility Commission dated August 5, 1970, which described the typical warranties obtained from suppliers in connection with Brunner # 3 as being limited to the cost of repair or replacement of defective parts. Moreover, Connell told Stevens of Foster Wheeler, which was interested in bidding on the steam generator for Brunner # 3, that PP&L was opposed to a Foster Wheeler contract because Foster Wheeler had not yet built a supercritical, once-through boiler such as was planned for Brunner # 3. Therefore, Connell continued, PP&L would have to take the risk of outages, which were a certainty for a first-time manufacturer (for it could not recover the cost of replacement power or other outage costs from Foster Wheeler).[24]

PP&L's treasurer, C. R. Collyer, gave deposition testimony, introduced at trial, to the effect that PP&L recognized the custom of the industry to be that suppliers of major equipment do not have the responsibility to compensate the utility for a unit's downtime. But even more importantly, PP&L's President, Jack Busby, told Ebasco's President, Roger Sherman, that it had not been the intent of the parties to impose the risk of consequential damages (and Mr. Busby had described cost of replacement power as a consequential damages claim) on Ebasco (and, we assume, *a fortiori* on any of Ebasco's suppliers), but stated that counsel had suggested that "new law" might be made in this case! Sherman stated in that

conversation that Busby's understanding as to the intention of the parties was his also.[25] Additionally, PP&L's Vice-President, Willard O. Baum, Mr. Connell's successor in charge of Power Systems and Engineering, testified that, based on what Ebasco told him and on information from PP&L engineers who had reviewed the purchase agreements, he did not believe that suppliers would be liable for consequential damages such as the cost of replacement power in the period 1964–67.

Finally, the record reflects a meeting at PP&L's Allentown Headquarters in December 1964 at which the Combustion Engineering unit made a presentation to a host of PP&L executives and engineers, including Connell and Baum. A memo summarizing the meeting, circulated to all in attendance, stated that, because of its competitive position, GE was obliged to quote the lowest-priced precipitator[26] that is guaranteed to meet the collection efficiency requirement. The memo, after observing that if the precipitator does not meet the guarantees, they (GE) are required to make corrections, goes on to warn that "this latter cause can be quite expensive to the client (PP&L) in terms of outage time." The memo adds that, for this reason, GE feels that "the client's specifications should include all necessary design parameters to assure a quality job." This memorandum itself demonstrated PP&L's awareness of the trade custom we have described. All told there was most impressive evidence that PP&L's top executives knew and were in accord with the trade understanding that

---

24. Crago's successor, Edward Nagel, even delivered a paper before the Edison Electric Institute in May 1969, which purported to have reviewed and analyzed the warranties of most of the foreign and domestic equipment manufacturers. Mr. Nagel and his PP&L associate, Genaro D. Caliendo, concluded that the warranties limited the utilities' remedy to repair or replacement of defective parts, and generally excluded liability for consequential damages, including loss of profits or revenues, and otherwise limited the amount of damages to an amount not to exceed the contract price of the equipment. Nagel, in his deposition testimony introduced at trial, agreed with the conclusions in his paper.

25. Also introduced at trial was a letter from Busby to a PP&L shareholder, who had inquired about the high operating costs at Brunner # 3. In that letter, Busby told the shareholder that "[u]nfortunately, loss of revenue due to failure to the Unit to operate as anticipated cannot normally be recovered." Ironically, the shareholder, a lawyer, is a partner in the law firm representing PP&L in this case.

26. A precipitator is a component of a dust collection system.

power generation equipment suppliers were not liable for cost of replacement power.

As we have previously noted, by the mid-sixties there had been a number of lawsuits filed claiming consequential damages, but, with one possible exception, there was no evidence that any of the suits resulted in recovery. The most noteworthy of these suits, although it was not a factor in the original Ebasco-GE negotiations, is that filed against GE by Kansas City Power & Light Company in 1964. Evidence of the second noteworthy suit was developed via the testimony of one of GE's key witnesses on trade custom, Walter E. Beckjord, Vice-President & General Counsel of Cincinnati Gas & Electric Co. Mr. Beckjord testified, in line with our previous findings, that the trade custom during the period in question was that suppliers were not liable for cost of replacement power under the conventional agreement forms (and even without reference to them). Mr. Beckjord conceded that this longstanding pattern was being assaulted, and he somewhat embarrassedly confessed that, as counsel for Cincinnati Gas & Electric, he had asserted a claim for cost of replacement power against Westinghouse and a firm known as Oberle Jordre in a suit filed in the United States District Court for the Southern District of Ohio in April 1970. The case was settled, and some portion of the settlement was apportionable to cost of replacement power. Mr. Beckjord attributed the settlement, at least in part, to what he considered to be, at best, an aberrational court decision. As we read Mr. Beckjord's testimony, although the longstanding custom was beginning to erode, the erosion was in a nascent stage at the time of the events relevant to this case (of course, the Cincinnati suit was not even filed until 1970, well after the negotiations at issue here).

Although by the mid to late 1960's there were exceptions to the established custom apparently emerging, we find the fabric of the conventional custom and understanding to have been still intact at the times critical to this case.[27] The evidence of the Kansas City Power & Light suit, the Cincinnati Gas & Electric suit, and the other suits mentioned in the record does not cause us to alter the findings stated above. This is particularly so in light of our findings about the specific understanding of GE, Ebasco, and PP&L executives on the subject.[28]

---

27. This is not unlike a deed restriction case in which a court finds that sporadic violations of a deed restriction are not sufficient to break the neighborhood pattern, and that the dominant tenement is still entitled to protection of the deed covenant.

28. GE has submitted extensive requests for findings under a heading entitled "Origins of a Reason Why the Custom and Usage was Accepted and Adhered to by Both Utilities and Suppliers of Power Generation Equipment." The thrust of GE's presentation is that the custom that manufacturers and suppliers are not liable for consequential damage resulting from outages, however caused, stems from principles of "fairness and practical common sense, that result from certain unique and special considerations affecting this industry." These considerations are said to include such factors as:

    (a) The fact that because of the size, complexity, high speeds, critical tolerances, and innovative nature of such equipment, frequent forced or scheduled outages are inevitable and cannot be completely eliminated in spite of the extraordinary care and precision with which such machinery is designed, manufactured, or operated.

    (b) The potential financial risk of these outages is too great for the suppliers to assume under the prices that are charged for the equipment. Furthermore, they could not be predicted or calculated with any precision.

    (c) Utilities can manage and control the risk more efficiently and at less cost than the suppliers.

    (d) There are unique factors in the power generation industry, between utilities and the major suppliers, that have resulted in a close, good-faith working relationship that is of greater importance to each than resorting to the use of lawyers and litigation to protect the parties' interests or to solve problems that may arise. Utilities attempting to impose liability for consequential damages on suppliers would destroy this relationship.

    (e) The suppliers have refused to accept liability for consequential damages because the potential for asserting such a claim may, because of difficulty of fixing responsibility, expose the suppliers to accepting, for all practical purposes, a liability without fault.

The course of dealing between Ebasco and GE prior to 1967 is congruent with the trade custom and understanding that we have described. For the most part, Ebasco's standard terms and conditions were accepted by GE, with the gloss on their textual language supplied not only by the trade custom and understanding, but also by the specific declarations of GE and Ebasco representatives described above.

There were Ebasco-GE contracts on 5 power plants during 1964, 1965, and 1966 and, as noted above, 4 purchase orders on Brunner # 3, all on Ebasco Standard Terms. This was not an inflexible practice, however. For instance, in July 1964 dealings between GE and Ebasco in which Ebasco acted on behalf of Middle South Utilities, GE Handbook terms were used.

Although PP&L relies heavily on the course of dealing, which includes acceptance by GE, more often than not, of Ebasco's standard terms, the important point is that the "course of dealing," see pp. 211–212 infra, must be read in light of the announced understanding by Ebasco and GE of the meaning of the Ebasco standard terms. In that light, "course of dealing" weighs heavily in favor of GE, not PP&L.

### D. GE's Response to the July 21, 1964 Ebasco Purchase Order

It was against the background just described that GE entered into its July 1964 discussions with Ebasco about the steam turbine generator for Brunner # 3. As our findings suggest, although GE did not believe that the Ebasco standard terms referenced in Salerno's July 21, 1964 purchase order subjected GE to liability for consequential damages such as cost of replacement power, GE preferred its own Handbook form, which was more explicit. However, the tenor of GE's response to Saler-

no's reference to Ebasco terms is a point in dispute, and our findings on the subject now follow.

Robert Davis, of GE's New York City Sales office, forwarded the Ebasco letter of July 21, 1964, which referenced Ebasco standard terms, to Schenectady. Cox and Pendzick made notes of those of Ebasco's statements with which GE disagreed. Cox noted objection, inter alia, to Ebasco's statement that a contract would be issued with the terms and conditions of the usual type of contract issued by Ebasco. By internal GE letter dated August 6, 1964, R. W. Snyder of GE's Marketing Department in Schenectady commented to Davis on Ebasco's letter of July 21, 1964, noting that the reference to Ebasco terms and conditions could be "confusing," and suggested that Ebasco change its "letter of intent" (i. e. the July 21, 1964 letter) to conform to the wording used in GE's letter of July 15, 1964.[29] Cox directed that the matter of Ebasco's July 21, 1974 letter be straightened out. As a result of Cox's directive, Pendzick followed through by requesting Davis to pursue Snyder's letter. Pendzick wrote:

I don't feel that we should wait until this order is firmed up to ask Ebasco to rewrite their order letter of July 21, 1964. I think we should do it now so as not to give the impression we have accepted Mr. Salerno's letter of July 21, 1964.

On October 1, 1964, Salerno supplemented the Ebasco intent letter of July 21, 1964 with acceptance of some of the comments made by Snyder to Davis on August 6, 1964. We infer from the fact that this letter discusses point by point the comments made by Snyder to Davis that Davis had discussed with Ebasco the matters raised by Snyder. By internal letter dated October 6, 1964, Davis forwarded to Pendzick copies of

The reasons given make good sense and provide a reasonable basis for such a rule. Moreover, there is support in the record for the most important of the stated factors, and we adopt (a), (b), and (c) above as our factual findings. However, because (d) and (e) are not supported and because there is inadequate support in the record to establish these factors as the basis for

the custom, we decline to adopt these factors as the origin of the trade custom. See also the GE Marketing Information letter described at 181–182 supra.

29. Salerno's July 21, 1974 letter is referred to variously as a "letter of intent," a "purchase letter," and an "order letter."

Ebasco's supplemental letter of intent, commenting that these letters should take care of Schenectady's comments on Ebasco's letter of July 21, 1964, except for Ebasco's reference to the "usual type of contract issued by Ebasco." Mr. Davis expressed his belief that this point could be covered in GE's acceptance.

By internal GE letter dated December 7, 1964, Pendzick, on Cox's instructions, advised Davis to accept Ebasco's letter of intent based on "mutually agreeable terms and conditions." Pendzick testified that this meant to him that GE could insist on GE terms, which was his understanding as to the basis of the original order.

As we have noted, by letter dated March 5, 1965, Salerno wrote to GE to "release" the turbine generator for design and production, advised GE of certain basic specifications of an engineering nature, and requested shipment in June of 1967. Cox believed that in the interim between December 7, 1964 and the release dated March 5, 1965, GE and Ebasco were discussing technical items, particularly the heat balance, which is the critical starting point for the design. The letter of March 5, 1965 stated Ebasco's instructions to GE on technical matters, including the heat balance. Meanwhile, the review of Ebasco's July 15, 1964 purchase order continued in Schenectady. GE's comments were internally memorialized and ultimately communicated to Ebasco in Pendzick's May 4, 1967 letter taking detailed exception to the Ebasco proposal.

GE's formalized exceptions to the Ebasco proposal were thus delayed for a long time. (We have already drawn the inference that GE had, prior to October 1, 1964, excepted informally.) In proper perspective, however, this response was not delayed unexpectedly, for, as we have already suggested, it was widely recognized and customary within the power generation industry that a formal contract, with all the essential commercial terms and conditions, frequently might not take final shape for a long period of time after an order was placed. A lapse of two to three years for major equipment purchases was not unusual.

William Stevens, Executive Vice-President of Foster Wheeler, was one of those who testified about the custom in the industry for the purchase of equipment. Before actually executing a contract with a customer, Foster Wheeler often utilized a brief letter of intent containing no contract terms or conditions. Foster Wheeler, as supplier, often would work quite far along before the final contract was ultimately decided upon and signed. Donald Wilson of Babcock & Wilcox described the manner of forming a contract. He stated that it could start with a verbal award or letter of intent, which would ripen into a preliminary purchase order and then into a finalized agreement over a period of time, often a few years. Mr. Beckjord testified to the same effect.

The evidence established that it was also customary for GE, in connection with the sale of large steam turbine generators and boiler feed pump turbines, to proceed with the manufacture of steam turbine generators on the basis of long history with these customers, even though GE knew that there were further documents to be signed. Indeed, Mr. Cox testified that there were occasions on which the turbines were delivered and the plant was actually in operation before final contracts were signed! The commitment for the equipment was usually confirmed with a letter of intent. Since most utilities wanted a great deal of engineering information in their contracts, the preparation of the contract documents was necessarily delayed. After a proposed GE contract was sent to the field offices, it was presented to the customer. Thereupon, contract discussions began, frequently lasting over a period of months or years. Ebasco knew of and had participated in this custom and practice, and PP&L knew of it as well.

Were GE's formal exceptions untimely? In addressing the timeliness question, we consider a number of factors. First, we consider the practice, just described, of

lengthy delays in executing contract documents. Second, we consider that in this case, congruent with the custom, there had been ongoing discussions concerning various technical details and contract terms for close to three years, with a general understanding by both parties that in due course a final contract would be negotiated. Finally, the ultimate delivery of the turbine was still some time away, and Ebasco was content to delay final negotiations to obtain added leverage. Under these circumstances, we do not view GE's formal exceptions as being untimely.

### E.   Ebasco's Authority to Negotiate Supplement 16

On March 10, 1966, Ebasco and PP&L executed a contract covering Ebasco's responsibility for Brunner # 3. Article II.A. set forth Ebasco's general charter:

> Ebasco shall, at its own cost and expense, design, engineer, construct and install the Project, and for this purpose shall furnish any and all design and engineering services and supervision, all facilities, equipment and material, and all supervision and labor necessary for the completion of the Project, within the time and on the terms and conditions provided for in this agreement.

Article II.B. of the contract defines Ebasco's authority and obligations for the procurement of Permanent Project Equipment, including the turbine generator, in the following terms:

> B.   The Permanent Project Equipment described by Appendix D shall be provided by Ebasco with its own funds from among the list of bidders set forth in Appendix E. For this purpose Ebasco shall, in a good, substantial and workmanlike manner, in strict accordance with the requirements of all municipal, state or federal authorities having jurisdiction in the premises and at its cost and expense, perform the following services:

1. Prepare inquiry specifications and transmit them to PL at the time of issuance of the inquiry.

2. Prepare inquiries, solicit quotations, analyze and evaluate bidders' proposals and advise PL of Ebasco's selection of a vendor and of the proposed date of purchase commitment.

3. Prepare and issue all purchase orders and necessary supplements thereto.

.      .      .      .      .

7. Prepare and furnish to PL periodic reports on the status of production of equipment and material purchased.

.      .      .      .      .

10. Secure fulfillment of purchase order contracts in accordance with the provisions thereof.

11. Perform any and all other services and functions which may be necessary in order to initiate and complete the purchase and timely delivery of Permanent Project Equipment conforming to specifications and bearing appropriate warranties and guarantees.

.      .      .      .      .

In purchasing Permanent Project Equipment, Ebasco shall in all cases use its best efforts to obtain for PL warranties against defects in design, workmanship and materials, the most favorable possible guarantees of performance, and the most favorable possible indemnifications against the consequences of patent infringement, recognizing that the Contract Price is based upon obtaining customary warranties and guarantees and that appropriate adjustments will be made, pursuant to change order as provided in Section II, Paragraph E hereof, to cover increased costs, if any, of equipment occasioned by obtaining the most favorable possible guarantees. It shall also, at PL's request, and at no extra charge, assist PL in

enforcing such warranties, guarantees and indemnifications.

There is no dispute either that Ebasco had express authority to place an order for the steam turbine generator with GE on July 15, 1964 or that Ebasco's authority from PP&L included negotiation of commercial terms and conditions for the turbine generator contract. In the ordinary case, therefore, there would be no question about Ebasco's authority to agree to the terms of Supplement 16. The issue that confronts us here is a more sophisticated and rather elusive one—whether Ebasco possessed sufficient authority to negotiate, and give up in the final negotiations (for Supplement 16), rights in respect to (non)limitation of GE's liability that it had won either in earlier negotiations or by operation of law (i. e., U.C.C. § 2–207). As we have noted above, if Ebasco did not possess such authority, and if there were in fact pre-existing superior rights, then Supplement 16 might not be valid.

It is already obvious that our previous findings have undercut the basis for PP&L's contentions on the authority point, for the import of those findings, see Part II.B. supra, and see text accompanying notes 39–41 infra, is that Ebasco had won no rights for PP&L—either in the Cox-Bonin conversation, in the documents that followed, or by operation of law—that were denigrated by Supplement 16. However, given the magnitude of this case it would be inappropriate to adjudicate it without findings on all important points; hence, we make findings on the authority question as well. In the course of so doing we will make findings of fact from which conclusions of law can be drawn as to Ebasco's inherent, implied, and apparent agency power to bind PP&L to Supplement 16, assuming arguendo that greater contractual rights had vested in PP&L theretofore. Obviously, there was no express authority conferred upon Ebasco by PP&L to dilute its rights, although—to repeat—in the absence of greater pre-existing rights there is no question of Ebasco's authority to sign Supplement 16. It is important to note at

this juncture, however, that to talk in terms of "downward" negotiations without more rather stacks the deck, because if Ebasco gave something up on one point but won other concessions—i. e., negotiated a quid pro quo—then there was no dilution at all. We would then come full circle—to conventional express authority to negotiate commercial terms, which we find that Ebasco possessed.

It is helpful to begin with a discussion of the breadth of the authority conferred upon Ebasco by PP&L, for that bears on a number of legal theories. Ebasco's authority was best expressed in the testimony of PP&L's President, Jack Busby. Busby looked at the contract as one

> between PP&L and Ebasco and Ebasco being responsible for bringing all the pieces together including procurement of equipment necessary to make the project go. My concept was looking to Ebasco.

Responding to the question whether PP&L expected Ebasco to impose on suppliers a liability to make good on replacement power, Mr. Busby repeated that he looked to Ebasco and that "what they did with the suppliers was something else and I wasn't concerning myself with that." Responding to an inquiry about the turnkey concept, Busby replied that (unlike PP&L's conventional cost-plus approach):

> . . . this was for a fixed price at a fixed time, and there wasn't a reservation of authority and the final decision-making by the company in the way this conventionally has been reserved . . . when we signed the contract we did so with the framework of ultimate responsibility being Ebasco's rather than PP&L's.

Mr. Busby's testimony reflected general trade custom in this area, for, we find, it was customary for architect-engineers purchasing project equipment, as Ebasco was for Brunner # 3, to have extremely broad authority. Supporting this conclusion was the testimony of Donald Wilson, Commercial Manager of the Marketing Division of Babcock & Wilcox (B&W) from 1961–68. B&W was a major manufacturer of equip-.

ment for the power and energy field, including equipment for steam generating units for power plants. Wilson was in charge of checking terms, conditions, and specifications in offerings in connection with power plant equipment. In the course of his duties, he had become familiar with the methods by which utilities purchased major equipment for power plants, as well as with the practice of utilities in using architect-engineers (or "engineer-constructors"), such as Ebasco, to act for them in the construction of power plants, including the purchasing of major equipment. Wilson had experience in the 1960's with approximately sixty projects in which B&W sold major equipment to an engineer-constructor who was signing the purchase contract on behalf of the utility.

In those instances in which the engineer-constructor (such as Ebasco) was acting as agent on behalf of the owner in connection with the purchase of equipment, B&W considered the engineer-constructor to be authorized to do any and all things, the only exception being that sometimes payments would be made directly by the utility. This generally expansive authority included negotiating technical specifications, terms of payment, and commercial terms such as the guarantee and limitations of liability. Wilson and B&W never felt compelled to go to the owner to ascertain the authority that the engineer-constructor had, and had no knowledge of any limitations ever being placed on an engineer-constructor regarding its authority to negotiate commercial terms and conditions, even if those terms

and conditions were less favorable to the utility than those that had been referenced in a letter of intent.[30]

Additionally, it was GE's experience that architect-engineers, such as and including Ebasco, had broad authority from their utility clients to deal with GE in connection with the purchase of a turbine generator.

Turning to the extent to which PP&L gave Ebasco a free hand with respect to the negotiation of contractual terms, we find that Ebasco's authority was virtually absolute. PP&L left all decisions on commercial terms up to Ebasco and, because of the turnkey arrangement, did not become involved in negotiations.[31] This fact is consistent with and corroborates the trade custom that we found to exist—i. e., the type of authority conferred upon Ebasco was similar to that customarily conferred upon architect-engineers by their utility clients in the power generation field. That finding also bears upon the extent to which PP&L held out Ebasco as an agent with full authority to negotiate all technical and commercial terms.

Also germane to the issue of Ebasco's authority is the extent to which PP&L knew of the state of contractual negotiations between Ebasco and GE and did anything to limit Ebasco's authority or advise GE that Ebasco's authority was limited. In this regard, we find that PP&L knew that there was no final contract prior to October 1967 and that Ebasco would, as part of its obligations to PP&L, have to negotiate final commercial terms.[32] Indeed, Mr. Busby

30. Mr. Sherman of Ebasco stated, on the other hand, that once terms were fixed the utility client's consent was necessary to change them. We credit Mr. Wilson on this point, his testimony being consistent with the zeitgeist of Mr. Busby's views.

31. The only discussion between Ebasco and PP&L on commercial terms of supplier contracts took place at a meeting on November 23, 1964, at which Mr. Baum was present for PP&L. PP&L asked about Ebasco guarantees and warranties, and specifically asked whether PP&L could ask Ebasco to correct any trouble that might arise during the first year or whether it would have to go back to the manufactur-

er. Ebasco advised PP&L that it assigned all manufacturer warranties to PP&L so that warranties could be handled directly between PP&L and the manufacturer. We infer from PP&L comments at this meeting, as reflected in the memoranda of the meeting, that PP&L did not expect any greater protection from equipment suppliers than repair or replacement. PP&L at no time mentioned or requested that Ebasco obtain protection from suppliers for the cost of replacement power at this meeting (or at any other time).

32. Even if PP&L only had "reason to know," the result would be the same.

lamented that it was usual that there was a long lag in working out final contract details and that technical specifications and price commonly were arrived at before commercial terms. We add, however, some additional observations on this point.

In the first place, PP&L perforce knew of the differences between the GE letter of July 14, 1964 and Ebasco's letter of July 21, 1964. On August 20, 1964 Mr. Baum reported to the PP&L Management Committee: "Ebasco has placed an order with a *letter of intent* for the turbine generator, although size has not already been determined, and is preparing to ask for quotations on the boiler . . ." (Emphasis added). Mr. Baum knew that the "letter of intent" would be followed by the preparation of a more formal contract or a purchase agreement at some time in the future. Further, when PP&L received the "Advance Copies" of various purchase orders from Ebasco in June 1965 and commented thereon in August 1965, PP&L indicated an awareness that final contracts did not exist and that further negotiations were necessary.

Baum conceded that it would have been a simple matter anytime thereafter to call up whomever he was dealing with at Ebasco in order to inquire whether the letter of intent had been converted into a formal written contract, but he never did so. Additionally, Baum knew from his discussions with Mr. Salerno on November 23, 1967 and from Salerno's letter of November 28, 1967 that Ebasco was then having negotiations with GE for the turbine generator contract. Moreover, Mr. Baum's response of December 28, 1967 (Ex. 2525) to Mr. Salerno authorized Ebasco to "negotiate further."

Turning to the touchstone of this case—the issue of protection against claims for cost of replacement power—in the March 10, 1966 contract between Ebasco and PP&L Ebasco was obligated to use its best efforts to obtain for PP&L only:

¶ warranties against defects in design, workmanship and materials,

¶ the most favorable guarantees of performance, and

¶ the most favorable possible indemnification against the consequences of patent infringement.

There were no directions, instructions, or obligations for Ebasco to obtain protection for PP&L for the cost of replacement power. Moreover, when Connell of PP&L corresponded and met with Sherman of Ebasco in the summer of 1965 on the subject of the "advanced copies" of the proposed order for the turbine generator and requested certain revisions and/or additions of a technical nature before release to suppliers, Connell did not in any manner suggest that any provision should be inserted into the supplier contracts to obligate the suppliers to be responsible for the cost of replacement power in the event of outages. PP&L did not even do so when faced later on with the knowledge that GE and Ebasco were negotiating disputed commercial terms, which dealt, *inter alia*, with cost of replacement power.

PP&L had constructed its own power plants before, using GE equipment, without the intervention of a turnkey contract. The turnkey arrangement itself resulted in PP&L's holding Ebasco out as having broad authority over commercial terms. PP&L's continued absence from the negotiating picture and the free hand given Ebasco reinforced that holding out. The holding out was also many faceted. Much of the correspondence to GE from Ebasco was signed "Pennsylvania Power & Light Company by Ebasco Services Inc." Ebasco not only issued the purchase order to GE in March 1966; it issued to GE fifteen supplements prior to Supplement 16, all without intervention by PP&L. Ebasco continually discussed with GE technical as well as commercial terms of the turbine generator contract. The discussions in 1967 leading up to Supplement 16 were consistent with the manner in which Ebasco had previously done business with GE, and there were no written communications from PP&L to GE concerning any limits on the authority of Ebasco to construct the plant, to order and execute contracts for equipment, or to negotiate the commercial terms and conditions with GE.

Earlier in these findings we discussed at some length the events and sequellae of the October 26, 1967 meeting. In our findings *infra* addressing PP&L's tortious interference claim, wᵉ will, a bit more formally, note our finding that there was a quid pro quo involved. Assuming that fact here, we find that Ebasco plainly had authority to negotiate that quid pro quo. Going a step further and addressing the question of Ebasco's authority to dilute PP&L's rights (*i. e.*—if there was no quid pro quo), we believe that given all of our findings on agency, Ebasco had the authority to do so.

We note as a final possibility that it would be legally possible for PP&L to be bound to GE on account of certain types of authority given to Ebasco, even though, viewing Ebasco and PP&L *inter se*, Ebasco lacked that authority. In such a case Ebasco would be liable to PP&L for acting in excess of its authority. It is important to note at this juncture that this is precisely the claim asserted by PP&L against Ebasco that was settled just prior to the commencement of trial.[33]

In sum, in the area of the PP&L–Ebasco agency, we find the following: Ebasco had broad authority to bind PP&L to commercial terms and conditions, including those such as were negotiated in Supplement 16. The type of authority conferred upon Ebasco was similar to that customarily conferred upon architect/engineer/constructors in the power generation field by their utility clients. PP&L gave Ebasco a free hand in the final negotiations of commercial terms even though it knew that critical matters, including cost of replacement power, were at issue; it did not fetter Ebasco's authority to negotiate limitation of liability provisions. PP&L held Ebasco out as having full authority—that is, its actions (and inactions) led GE to believe that Ebasco had full authority—notwithstanding its knowledge of the pendency of the negotiations that led to Supplement 16. Moreover, GE, based on its many years of experience in dealing with Ebasco and other architect-engineers, justifiably believed that Ebasco would have the usual broad authority to negotiate Supplement 16 in the manner that it did.

Finally, and this is an important point not mentioned heretofore, the actions of Ebasco were incidental and reasonably necessary to arrange for the purchase of the equipment for Brunner # 3.

### F. The Question of Ratification by PP&L of Ebasco's Actions

On November 23, 1967, after GE and Ebasco had agreed on the language of what eventually became Supplement 16, but before Ebasco issued Supplement 16 to GE, Ebasco's Salerno telephoned PP&L's Baum and related the recent negotiations with GE on commercial terms and conditions, which covered the topics of technical direction of installation, warranty, limitation of liability, and patents.[34] *Inter alia,* Salerno explained that GE would not accept the supervision aspect for the price quoted; that if supervision was involved, GE wanted more money; that the limitations arrived at with respect to implied warranty were less favorable but the warranty period was longer; that GE wanted a 3% adder for eliminating the limitation of liability language; and that GE disclaimed responsibility for patent infringement associated with purchase, design, or use. We find that the statements made by Salerno to Baum gave an accurate picture as to what had transpired at the October 26, 1967 meeting. Salerno told PP&L he wanted it to decide on GE offers of the contract adders.

By letter dated November 28, 1967, Salerno followed up on his November 23, 1967 telephone call to Baum with a letter "covering commercial conditions under discussion with General Electric relative to the turbine-generator and boiler feed pump turbines covered by the subject contract."

33. We do not, however, know the details of any of the brink-of-trial settlements in the case; we instructed counsel not to disclose them to us, because we did not want them in any way to affect our decision in the case now *sub judice.*

34. Salerno is deceased, but Stolz testified regarding Salerno's statements to Mr. Baum on the matters discussed at the October 26, 1967 meeting with GE and subsequently.

Salerno stated that Ebasco, in purchasing permanent project equipment, had used its best efforts on behalf of PP&L. He quoted to Baum the GE offer to eliminate the GE "limitation of liability" language for a payment of 3% of the contract price and the GE offer to agree to the "superintendence of erection" clause of the Ebasco purchase order in lieu of GE "technical direction of installation" at a charge of $.50 per $100 of contract value. Nagel, of PP&L's legal department, received a copy of Salerno's letter to Baum and prepared a draft of a reply letter from Baum to send to Salerno. Nagel understood from the Salerno letter that GE was offering two contract adders and that Ebasco was requesting PP&L to notify Ebasco if it wanted either or both of those adders.

PP&L decided not to pay the 3% adder because it was of "questionable benefit." Thus, PP&L recognized that GE would not be liable for consequential damage even if no specific exclusion of consequential damages was written into the contract. And Baum so advised Salerno. Baum then made the decision to request Ebasco to "negotiate further regarding limitation of liability" and authorized Ebasco to substitute "Technical Direction of Installation" for "Superintendence of Erection."

Salerno replied to Baum by letter dated January 3, 1968, enclosing a copy of Supplement 16. In that letter Salerno stated that Ebasco had been able to negotiate with GE more favorable wording than that contained in the GE Handbook, including elimination of the use of the words "consequential damages"; that Ebasco believed the clause as written more clearly defined the damages against which GE intended to be relieved; and that these modifications were made at no change in price. PP&L had also received a copy of Supplement 16 on December 7, 1967 as part of its separate file on purchase order NY-668001. This file indicates that Ebasco sent PP&L the initial purchase order and all succeeding supplements as they were issued by Ebasco.

Salerno's letter of January 3, 1968 was the last communication between PP&L and Ebasco on the subject of commercial terms and conditions for Brunner # 3. Mr. Baum distributed the January 3, 1968 letter from Salerno, together with a copy of Supplement 16, to Mr. Crago, who was the General Counsel of PP&L, and also to Messrs. Collyer and Frederick. PP&L made no objection and took no action with regard to Supplement 16 until the filing of this lawsuit in August 1972. Nor did PP&L rescind any of Ebasco's authority. Moreover, after PP&L received a copy of Supplement 16, Ebasco issued to GE Supplements 18–22 for the turbine generator contract without objections from PP&L, which received copies in the usual course. The last supplement, number 22, was dated June 20, 1969. A copy was issued to PP&L on July 1, 1969.

The essence of PP&L's arguments against a finding of ratification is the contention that Ebasco did not keep PP&L fully advised of what was going on, particularly with regard to the nature of its prior relationship with GE. While Ebasco doubtless did not relate every detail of the complex evolving GE/Ebasco scenario to PP&L, we know of no *material* thing that PP&L needed to know that was withheld. The basic and salient features were communicated, and, after all, PP&L was no novice in the field. Insofar as the alleged failure to detail the history of the GE–Ebasco relationship is concerned, PP&L is really saying that Ebasco did not relate that history according to the tenor of PP&L's version thereof. But we have, in our findings, rejected the PP&L version. In any event, we have drawn different inferences than PP&L as to the import of that relationship. For example, we have found that cost of replacement power was not recoverable even under the Ebasco standard terms. Under our findings, the history of Ebasco's relationship with GE would have been immaterial.

### G.  *PP&L's Tortious Interference Claim*

The essence of PP&L's tortious interference claim is that GE coerced Ebasco into agreeing to Supplement 16, against the interests of its client, PP&L, by threatening a

price increase on the turbine generator, by diverting certain nozzle boxes from Brunner # 3 to the Detroit Edison contract, and (mainly) by holding up the shipment of the exhaust hood bolts, which retarded the progress of Brunner # 3 at a critical period. GE's motive for this alleged conduct is said to have been: (1) to disadvantage PP&L on Brunner # 3 by securing the specific limitation of liability contained in Supplement 16; and (2) to extract from Ebasco a commitment that Supplement 16 would be a prototype for all future GE dealings with Ebasco, regardless of the client Ebasco was representing. We have already made extensive findings relative to PP&L's tortious interference claim, which we will rescribe during the course of this discussion.

The first question that should be addressed is whether GE had knowledge of any particular terms of the PP&L-Ebasco contract with which it allegedly interfered. We find no evidence that GE had any knowledge of the specific essential terms of the PP&L-Ebasco contract, including any knowledge of the warranties or protections that Ebasco was obligated to procure for PP&L. We turn next to the question of Ebasco's actual obligations under its contract with PP&L (a sine qua non of a tortious interference claim being that those obligations were interfered with).

Ebasco, under its contract with PP&L, was obligated to secure "warranties against defects in design, workmanship and materials" [35] and "the most favorable possible guarantees of performance." [36] However, as we have noted several times, it had no obligation as such to secure inclusion of the vendor's liability for consequential damages, including cost of replacement power. The Ebasco-PP&L contract also stated that the Ebasco price for constructing Brunner # 3 was based upon Ebasco obtaining "customary guarantees." But Ebasco did obtain what, in light of trade custom and understanding, were customary guarantees. Moreover, as we have also noted above, PP&L knew from the outset, both from Ebasco as well as from its own experience and knowledge of trade custom and understanding, that GE would not accept liability for consequential damages. Thus, PP&L did not expect to be able to recover from GE the cost of replacement power if, as, or when incurred.

An important element on a tortious interference claim is intention to harm. However, we find that GE, in negotiating the language of Supplement 16, did not believe that it was interfering with or watering down any rights of PP&L in this regard. Rather, GE reasonably believed that the original order was based on terms that excluded such liability. This result obtains whether GE believed it had a contract on GE terms or on Ebasco terms, for even if Ebasco's standard terms applied, in light of previous findings, GE was justified in believing that it had no liability for any type of consequential damages; that is what GE

**35.** As we have noted, Ebasco did secure from GE "Warranties Against Defects in Design, Workmanship and Materials." Contract NY–668001, including Supplement 16, contained a "Guarantee" clause under which GE warranted that the turbine generator "will be free from defects in material, workmanship and title and will meet the specifications contained in the contract."

**36.** We conclude that "Guarantees of Performance" refers only to kilowatt output of the turbine generator. The specifications in the GE contract stated the output of the turbine at certain specified design steam conditions. The "Guarantee" of Supplement 16 warranted that these specifications would be met or PP&L would be entitled to the remedies provided.

The turbine was originally described by GE and Ebasco in their letters in July 1964 to produce 700,000 kilowatts. In the "Advance Copy" of purchase order NY–668001, sent to PP&L by Ebasco on June 30, 1965, the turbine was specified to produce 714,963 kilowatts. As the result of PP&L requests, the final contract specified two guaranteed levels of kilowatt output: 714,963 and 730,566—depending on certain other plant conditions. Thus, Ebasco secured for PP&L the guarantees of performance that PP&L desired, and there can be no dispute that Ebasco met this contractual obligation to PP&L. In the final contract, including Supplement 16, GE still had responsibility for its equipment meeting performance guarantees.

had consistently been told by Ebasco long before the negotiations to work out final contract language began in October 1967.[37]

The critical time frame for the tortious interference claim is the late summer and early fall of 1964, culminating in the October 26, 1967 meeting. PP&L's principal complaint is that GE deliberately held up shipment of the exhaust hood bolts for the stream turbine generator in order to coerce Ebasco into agreeing to Supplement 16. We note again our rejection of that contention and our finding that Mr. Cox, whom we found to be a candid, forthright, and credible witness, held up the shipment in order to protect GE's position with respect to payment for the boiler feed pump turbines (for which GE reasonably believed payment to be past due, although Ebasco did not) and for the turbine generator itself.[38] We find that GE was faced with equally serious threats from Ebasco and that GE regarded Salerno, who was threatening not to pay for the turbine generator, as a tough and tenacious opponent at the bargaining table. Moreover, Salerno was content to delay the final contract negotiations, believing that it enhanced his own bargaining position.

As to Supplement 16 itself, we find it to represent a quid pro quo, in which each party to the negotiations made concessions. Supplement 16 did, as we know, contain an explicit exclusion of liability for cost of replacement power, but this was, in view of our previous findings, of questionable detriment to PP&L. Although PP&L has argued that Supplement 16 was intended as a prototype, and although apparently it has for the most part worked out that way,[39] we find no evidence that such a commitment was extracted in the Brunner # 3 negotiations on October 26, 1964 or otherwise. GE also obtained substitution of the "technical direction of installation" clause for the "superintendence of erection clause"[40] and elimination of liability for negligence, not provided for by the Ebasco standard terms. On the other hand, as we have noted above, GE made concessions in the October 26 bargaining. First of all, GE agreed to raise its liability for defects from the value of the defective part to the contract price of the entire unit (i. e. up to $10,000,000) and to extend the termination date of any liability under the contract from 4 to 6 years. These concessions also increased liability over GE's Handbook terms.

We therefore find from the evidence that Supplement 16 represented a compromise for each side. Stolz testified that Ebasco and PP&L gained ground in Supplement

37. While GE believed that it originally had a contract on GE terms, knowing the trade custom of negotiating over a period of years for final terms, it did not insist on the GE Handbook terms thereafter. Rather GE was content to alter the form but not the substance of the parties' original understanding—i. e., that GE would not be liable for cost of replacement power.

Alternatively, we find that, given trade custom and understanding, neither GE's nor Ebasco's principals had reason to believe that a U.C.C. § 2–207 contract existed following the exchange of forms represented by the July 15, 1964 and July 21, 1964 letters between GE and Ebasco.

38. We have based this conclusion not only on our judgment of Mr. Cox's credibility, but also on other reasons stated earlier in this opinion. We reject PP&L's contentions that GE had any ulterior motive for the switch in shipment of the nozzle boxes as between the Detroit Edison

and Brunner # 3 jobs. Neither do we find substance to PP&L's contentions about alleged threats, never actualized, to raise the price on the turbine generator, and that GE deliberately delayed # 3 contractual negotiations. We add that if Ebasco had seriously been worried about a price increase, Salerno would not have been so disposed to delay contract negotiations.

39. Strang wrote that GE would be willing to use Supplement 16 as basis for concluding other turbine contracts negotiated in the future. Salerno wrote that he expected this to be the basis for other contracts. There were 4 or 5 unsigned GE-Ebasco contracts in process at the time.

40. GE, it will be recalled, had offered to include Ebasco's clause for an adder of $.50 per $100.00 of the contract amount. After consulting on the adder, PP&L expressly authorized Ebasco to approve the technical direction of installation language.

16,[41] and neither Stolz nor Ebasco's president, Roger Sherman, believed that Supplement 16 detracted from the basic intent of the Ebasco terms. It may be that by way of 20–20 hindsight (*i. e.,* in light of the problems that emerged later) GE got the better of the quid pro quo, but we cannot permit such post hoc analysis to enter into our deliberations. Indeed, PP&L has not established here that Ebasco in fact breached its contract with PP&L.

Tortious interference analysis also subsumes the matter of privilege.[42] GE, of course, had a privilege to act to protect its legitimate commercial interests. GE had valid commercial reasons to seek more specific contract language to exclude any possibility that it would be held liable for cost of replacement power or other consequential damages. Indeed, it was common practice in the industry to do so, particularly in light of attempts being made in the 1960's by some utilities or their insurers to assert claims for consequential damages. Even if the Supplement 16 language in fact eventuated as a prototype, and even if that was what GE had hoped for, that would not constitute an abuse of privilege so long as GE did not induce Ebasco to trade off PP&L's rights in order to obtain some benefits for itself or others. We find that that was not done.[43]

Additionally, GE had a legitimate commercial interest in obtaining guarantees of payment before shipping all of the component parts, just as Ebasco had a legitimate commercial interest in delaying negotiations until it had a signed contract.

In sum, we find that PP&L has failed to demonstrate that Ebasco did not use its best efforts on behalf of PP&L. We further find that GE did not overreach or coerce or act improperly in the negotiation of Supplement 16 and that GE's actions were privileged.

This concludes our findings of fact. We turn now to our discussion of the applicable law.

### III. *Discussion*

#### A. *Introduction*

Our findings of fact have been extensive. However, because the trial that resulted in those findings was carefully charted on the basis of our lengthy opinion in *Ebasco I,* which described in great detail the applicable legal principles, and because the findings of fact are in effect dispositive of most of the issues before us, our discussion and conclusions of law will be briefer than they otherwise would be.

The trial was designed to determine two questions: (1) what is cost of replacement power? and (2) can PP&L recover from GE the cost of replacement power as an item of damages, assuming arguendo that PP&L can establish GE's liability? The first question, not a matter of great dispute, has been treated herein as a factual matter and, except as an ingredient in our discussion of general vs. special damages, need not be dealt with again. It is the second question that perforce shall occupy us, and we shall organize the bulk of our discussion of that question along the lines of the discussion in *Ebasco I,* with a view to making conclusions as to the validity of Supplement 16 to the steam turbine generator contract (NY–668001).

*Ebasco I* dealt solely with the steam turbine generator contract and, more specifically, with the matter of Supplement 16. It decided that if Supplement 16 is valid, PP&L cannot recover cost of replacement power on any theory (breach of contract, breach of implied warranty, negligence, strict liability,[44] or delay damages). As our

---

**41.** There were some advantages to Ebasco qua contractor that did not necessarily inure to its principal, PP&L.

**42.** For a discussion of the role of the privilege in this area, see *Ebasco I,* 402 F.Supp. at 455–56.

**43.** It was, we find, common in the industry for the major suppliers and the major engi-neer/constructors such as Ebasco and Stone & Webster to negotiate standard or overriding agreements regarding contract terms which applied to all of the engineer/constructor's utility clients.

**44.** PP&L added a strict liability claim prior to the trial.

findings of fact confirm, the trial was almost exclusively focused on those matters. However, the issues for trial also subsumed the question of PP&L's right to recover cost of replacement power on the other Brunner # 3 contracts—*i. e.,* those for power transformers ( # NY–668006); 450 switchgear, isolated phase bus, and power centers ( # NY–668007); station auxiliary motors ( # NY–668008); and volt motor control centers ( # NY–668009). Supplement 16 is inapplicable to these other contracts, which were accepted by GE on the basis of Ebasco's standard terms and conditions. However, the question of the meaning of Ebasco's standard terms is also an ingredient in our discussion of the U.C.C. § 2–207 issue, the authority issue, and the tortious interference issue. We shall therefore integrate our discussion of all these points. Concomitantly, the factual findings we have made also bear upon the limitation of liability question as it affects these other contracts.

### B. *Choice of Law*

Initially, the parties stipulated that the laws of Pennsylvania and New York were the same on all contract issues relevant to this case, *see Ebasco I,* 402 F.Supp. at 427 n. 4, and that, therefore, there was no conflict and no choice of law to be made. Even as of this writing, they do not dispute that the construction of the final contract, which was signed in December 1967 and which included Supplement 16, turns on New York law, for the contract contained a provision that New York law would govern. *See* U.C.C. § 1–105(1). And, they continue to agree that Pennsylvania law governs the tortious interference claim.[45]

The major area of dispute is that of the proper law to be applied to the dealings of the parties between July 15, 1964 and December 7, 1967, particularly with respect to limitation of liability. In the trial and post-trial briefs, the initial agreement of the parties on choice of law began to break down. GE initially maintained that New York law applied to all contract formation and interpretation questions, but after the opinion in *Posttape Associates v. Eastman Kodak Co.,* 537 F.2d 751 (3d Cir. 1976), *see* discussion *infra,* GE began to talk more about Pennsylvania law. In the wake of *Posttape,* PP&L took the position that the law of Pennsylvania and New York had diverged and opted for New York law with respect to the issue of limiting liability for negligence. We note, however, that in its trial brief, PP&L had maintained that Pennsylvania law should apply with respect to evaluation of the 1964 correspondence and all other matters occurring before December 7, 1967 (*i. e.,* the U.C.C. § 2–207 questions). Moreover, PP&L has stressed the impact of *R. I. Lampus Co. v. Neville Cement Products Corp.,* 474 Pa. 199, 378 A.2d 288 (1977), *see* discussion *infra,* a Pennsylvania case addressing the question of general versus special damages. The parties have thus not been altogether consistent on their choice of law contentions.

Choice of law in contract cases is not a simple matter where Pennsylvania is the forum state, *see Melville v. American Home Assurance Co.,* 443 F.Supp. 1064 (E.D.Pa. 1977). The traditional (Restatement, Conflict of Laws) rules, doubtless do not apply in a U.C.C. context. *See* U.C.C. § 1–105(1).[46] Under the interest analysis approach of *Griffith v. United Air Lines, Inc.,* 416 Pa. 1, 203 A.2d 796 (1964), *see Melville supra* (analysis of Pennsylvania's current approach), or the more significant relationship test of Restatement (Second), Conflict

---

**45.** The essential elements of the tort seem, in any event, to be the same in both Pennsylvania and New York. *See Ebasco I,* 402 F.Supp. at 427 n. 4; *Columbia Broadcasting System, Inc. v. Stokley Van Camp Inc.,* 522 F.2d 369 (2d Cir. 1975).

**46.** 12A P.S. § 1–105(1) provides that in a U.C.C. case in which the parties have not agreed on the choice of law to be applied "this Act applies to transactions bearing an appropriate relation to this state." The Pennsylvania Supreme Court has interpreted this language to require as a choice of law principle in U.C.C. cases "analysis of the policies and interests underlying the particular issues before the court." *Griffith v. United Air Lines, Inc.,* 416 Pa. 1, 203 A.2d 796, 805 & n. 17 (1964).

of Laws, sound arguments can be made for application of both Pennsylvania and New York law on the various issues. However, because of the facts that we have found, we need not engage in lengthy analysis of the choice of law question or decide it because, under either law, GE must prevail on the various issues. During the course of the discussion that follows, we shall consider the law of both states.

### C. Did Ebasco Possess Authority to Issue Supplement 16 (or, Did PP&L Ratify it)?

#### 1. Introduction

We commence with the authority question because, even if PP&L had somehow previously acquired contract rights greater than those conferred by Supplement 16, Supplement 16 is valid so long as Ebasco had authority to negotiate and issue it on PP&L's behalf. In *Ebasco I, see* 402 F.Supp. at 445–52, we analyzed the authority question in terms of four potential kinds of authority—express, implied, apparent and inherent—and in terms of the notion of ratification. We shall do so again, in the wake of our findings of fact. We discussed in *Ebasco I* the meaning of those legal concepts and will not repeat their description now. For the reasons that follow, our conclusion is that, under the facts as we have found them, Ebasco possessed express, implied, apparent, and inherent authority to issue Supplement 16.

#### 2. Express Authority

■ We note preliminarily that, if there were no claim of intervening acquisition of greater contract rights, there could be no colorable assertion by PP&L that Ebasco lacked authority to enter into Supplement 16. Ebasco's express authority to purchase permanent project equipment and to negotiate commercial terms and conditions in connection therewith would then plainly prevail. However, given the intervening acquisition claim, it cannot be said that Ebasco possessed *express* authority to negotiate downward and thereby to dilute rights

won for PP&L either via U.C.C. § 2–207 or on the theory that, even in the absence of § 2–207, there was a threshold contract for the steam turbine generator on Ebasco terms.

There is, however, the matter of "quid pro quo," which we have found to attend Supplement 16. In light of our finding that Supplement 16 represented a negotiating trade-off in which PP&L both won and lost certain contract advantages and considering the extremely broad authority conferred by PP&L upon Ebasco under the turnkey concept, we believe that Ebasco did possess express authority to negotiate and issue Supplement 16. The Supplement 16 negotiations fall within the continuum of Ebasco authority and responsibility for purchasing permanent project equipment and for negotiating commercial terms and conditions in connection therewith. We do not believe that an analysis of the advantages and disadvantages of Supplement 16 can be applied to alter this conclusion any more than PP&L could avoid what it deemed to be unfavorable terms of earlier Supplements on the ground that they were detrimental. We add only a reference to our finding that at no point in the PP&L-Ebasco dealings was Ebasco divested of its broad authority by a direction from PP&L to secure protection against the cost of replacement power. To the contrary, in accordance with the GE-Ebasco course of dealing and general trade custom, PP&L did not expect that cost of replacement power could be recovered.

#### 3. Implied Authority

■ We have found that Ebasco's extremely broad turnkey authority to get Brunner # 3 built included, among the acts incidental to or that usually accompany or are reasonably necessary to accomplish such a task, negotiating and issuing Supplement 16. The quid pro quo finding, of course, supports this conclusion, but it would in any event be supported by the finding that it was customary for engineer-constructors to have authority even to negotiate "down-

ward." It is also important to note in this regard that Supplement 16 cannot be deemed to stand apart from the general process of contract negotiations for, as we have found, it was customary within the power generation industry for a formal contract, with all the essential terms and conditions, not to be finally executed until years after the order was placed. Moreover, PP&L knew that before October 1967 there was no final contract, but only a letter of intent subject to further negotiations; thus, final negotiations were in fact anticipated by PP&L. In connection with implied authority, we referred in *Ebasco I* to § 33 of the Restatement (Second) of Agency and to Comment b thereto:

> An agent is authorized to do, and to do only, what it is reasonable for him to infer that the principal desires him to do *in the light of the principal's manifestations and the facts as he knows or should know them at the time he acts.* (emphasis added).

> Comment b. Authority distinct from contract of agency. An agent is a fiduciary under a duty to obey the will of the principal as he knows it or should know it. This will may change, either with or without a change in events. Whatever it is at any given time, if the agent has reason to know it, his duty is not to act contrary to it. The fact that in changing his mind the principal is violating his contract with the agent does not diminish the agent's duty of obedience to it. Hence the rule applicable to the interpretation of authority must be as flexible as the will of the principal may be. Thus, whether or not the agent is authorized to do a particular act at a particular time depends, not only on what the principal told the agent, but upon a great variety of other factors, including changes in the situation after the instructions were given. The interpretation of authority, therefore, differs in this respect from the interpretation of a contract, even the contract of agency.

We then observed:

> When PP&L and Ebasco first negotiated the agency contract, they did not cover the situation that arose when Ebasco and GE were unable to agree on the terms of the sale of the turbine generator unit. In such a situation, Comment b indicates that Ebasco's authority should be measured in light of the circumstances prevailing at the time difficulties in negotiating Supplement 16 were encountered. As we indicated previously, it is difficult to determine when viewed ten years later whether a § 2–207 contract existed while the Supplement 16 negotiations were proceeding. Whether Ebasco could reasonably have determined that one did exist, and whether, if one did, Ebasco could reasonably have been led to believe that PP&L would therefore have forbade the negotiation of Supplement 16 is a question for the trier of fact. Further, the fact finder would also have to take into account GE's forceful contentions that Supplement 16 was not a "downward" negotiation for PP&L but, rather, a quid pro quo.

402 F.Supp. at 448–49.

We have already resolved the quid pro quo question in GE's favor. We add here that we do not believe that Ebasco could reasonably have determined that a § 2–207 contract existed. Even if it could have so determined, we do not think that it could have reasonably believed that PP&L would, under all the circumstances, have forbidden this negotiation of Supplement 16. In short, under the facts as they existed at the time of the Supplement 16 negotiations and given Ebasco's broad turnkey authority (and, additionally, the quid pro quo that was negotiated), we are satisfied that Ebasco was doing what it was reasonable for it to believe PP&L would have wished it to do, in light of PP&L's manifestations and the facts as Ebasco knew them at the time (including PP&L's failure to give specific instructions on replacement power in the face of its knowledge of the negotiations leading to Supplement 16).

### 4. *Apparent Authority*

█ We have found that PP&L held out or manifested to GE that Ebasco was au-

thorized to negotiate Supplement 16 (as well as do everything else reasonably necessary in connection with Brunner # 3). PP&L put Ebasco in the traditional architect/engineer/constructor role, which included purchase of equipment and negotiation of commercial terms and conditions, but never advised GE of any limitations on Ebasco's authority, even in the presence of what it knew to be final negotiations to resolve a dispute about limitation of liability. GE, on the other hand, observed that PP&L had given Ebasco a completely free hand in the negotiation of commercial terms, even in the face of a veritable "blow up" over those terms in the summer of 1967. GE saw the PP&L-Ebasco relationship as tracking the conventional "all authority to the engineer" pattern prevalent in the trade. Under these circumstances, GE was, in our view, both led and entitled to believe that Ebasco was authorized to negotiate Supplement 16.[47]

### 5. Inherent Authority

■ Inherent agency power refers to the power of an agent, derived not from authority, apparent authority, or estoppel, but solely from the agency relationship. It exists for the protection of persons harmed by or dealing with a servant or other agent. Restatement (Second) of Agency § 8A. Moreover:

A general agent for a disclosed or partially disclosed principal subjects his principal to liability for acts done on his account which usually accompany or are incidental to transactions which the agent is authorized to conduct if, although they are forbidden by the principal, *the other party reasonably believes that the agent is authorized to do them* and has no notice that he is not so authorized. (emphasis added).

Restatement, *supra*, § 161.

■ Our findings of fact compel the conclusion that what Ebasco did for PP&L (even if without express or implied authority, *see Ebasco I*, 402 F.Supp. at 446), was what usually is done in connection with the transactions Ebasco was employed to conduct. Additionally, we have found that, in the trade, turnkey contractors have plenary negotiating power, even to negotiate downward—though, we reiterate, here there was a quid pro quo. Based upon its many years of experience dealing with Ebasco (and other architect/engineer/constructors) GE reasonably believed that Ebasco had the usual broad authority in connection with the turbine generator and Supplement 16. Given the stress laid by the Restatement upon promoting regularity in mercantile affairs by protecting the reasonable expectations of third parties who deal with the agents of known principals, we believe that it would be improper to deprive GE of the benefits of its good faith reliance.[48] We conclude that Ebasco also possessed inherent authority to execute Supplement 16.

### 6. Ratification

■ Ratification is defined by the Restatement (Second) of Agency § 82 as:

the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him.

Section 94 of the Restatement states: "An affirmance of an unauthorized transaction can be inferred from a failure to repudiate it." However, in order to find ratification from failure to repudiate the agent's unauthorized actions, it is necessary that the principal have full knowledge of the material facts and circumstances attending the transaction to be ratified. *Schwartz v. Ma-*

**47.** In addition to the cases cited in *Ebasco I,* see *Continental-Wirt Electronics Corp. v. Sprague Electric Co.,* 329 F.Supp. 959 (E.D.Pa.1971); *East Girard S & L v. Houlihan,* 373 Pa. 578 (1973); *Roth v. Ducks Hockey Club,* 52 Misc.2d 533, 276 N.Y.S.2d 246 (1966); Restatement (Second) of Agency, §§ 8, 27, & 49.

**48.** We reaffirm our reliance in this regard on *Diguid v. Bethel A.M.E. Church,* 119 Pa.Super. 493, 180 A. 737 (1935). Pennsylvania law may well govern the PP&L-Ebasco agency relationship but the result would, in our view, be no different under New York law. *See Ebasco I,* 402 F.Supp. at 446 n. 41.

*honing Valley Country Club*, 382 Pa. 138, 142, 114 A.2d 78, 80 (1965).

■ We have found as facts that after the October 26, 1967 meeting, Salerno phoned Baum and related the negotiations with GE on commercial terms and conditions covering the topics of technical direction of installation, warranty, limitations of liability, and patents, and that Salerno's statements gave an accurate picture as to what had transpired at the meeting. We have made findings on certain ensuing discussions and correspondence between PP&L and Ebasco and noted that PP&L received a copy of Supplement 16 on December 7, 1967, and yet made no objection and, while receiving later supplements, neither took action with regard to it until filing this lawsuit nor attempted to rescind any of Ebasco's authority.

During the course of our findings of fact, we have also commented upon PP&L's arguments against a finding of ratification, which are founded on the contention that Ebasco did not keep PP&L fully advised of what was going on and particularly of the nature of its prior relationship with GE. We observed:

> While Ebasco doubtless did not relate every detail of the complex evolving GE/Ebasco scenario to PP&L, we know of no *material* thing that PP&L needed to know that was withheld. The basic and salient features were communicated, and, after all, PP&L was no novice in the field. Insofar as the alleged failure to detail the history of the GE-Ebasco relationship is concerned, PP&L is really saying that Ebasco did not relate that history according to the tenor of PP&L's version thereof. But we have, in our findings, rejected the PP&L version. In any event, we have drawn different inferences than PP&L as to the import of that relationship. For example, we have found that cost of replacement power was not recoverable even under the Ebasco standard terms. Under our findings, the history of Ebasco's relationship with GE would have been immaterial.

Text *supra* at 196.

PP&L thus had knowledge of the *material* facts concerning the negotiations leading up to Supplement 16. Even after receiving a copy of Supplement 16 PP&L did nothing that would suggest rejection. Furthermore, PP&L manifested approval of Ebasco's acts by allowing Ebasco to continue to negotiate and issue Supplements 18–22, as late as June 1969. Under these circumstances, we hold that PP&L ratified Supplement 16.

## D. *PP&L's Tortious Interference Claim*

■ As we have pointed out in *Ebasco I* and above, if Supplement 16 was the product of tortious interference by GE with the contractual and/or fiduciary relationship between PP&L and Ebasco, it cannot stand. GE would then be liable to PP&L for any damages sustained in connection with GE's role in Brunner # 3 as if Supplement 16 had never been issued. The question of what GE's liability would have been in such event is one consideration in our discussion of PP&L's § 2–207 claim and the authority and tortious interference questions. We might logically have discussed that question first, for, as we have already seen, the manner of its disposition, if correct, moots a number of other issues. Obviously, however, in a case of this magnitude it is prudent to address all cognizable issues. We take the contract issues last because they take the longest and because they cover all the contracts, steam turbine generator and otherwise. We turn now briefly to the tortious interference claim.

We discussed the elements of the tort of tortious interference in *Ebasco I, see* 402 F.Supp. at 452–56, and shall not prolong this opinion by further recitation. Neither is an extensive treatment of the factual basis of our conclusion—that PP&L's tortious interference claim must fail—indicated, for our detailed findings of fact require the result we reach. *Inter alia*, we have concluded that Mr. Cox held up the exhaust hood bolts not to force Ebasco to

execute Supplement 16 but to insure payment for the boiler feed pump turbines and the turbine generator itself. We have found no wrongdoing in connection with the Detroit Edison nozzle boxes and no threat to raise the price of the turbine generator. We have found that Mr. Salerno made as many threats as Mr. Cox in the hard bargaining which led to Supplement 16, and we found that the Supplement was a quid pro quo. Moreover, we have found that neither GE nor Ebasco (nor PP&L) thought that GE would be liable for cost of replacement power in the absence of Supplement 16, and we find, see discussion infra, that both were essentially correct in this view. Finally, we have found that GE did not coerce Ebasco with a view to procuring Supplement 16 as a prototype contract on all GE-Ebasco dealing regardless of Ebasco's utility client.

The foregoing are what might be described as subsidiary facts. In terms of ultimate facts, we conclude that: (1) PP&L has failed to prove that Ebasco breached its contract with PP&L; (2) PP&L has failed to prove that GE had specific knowledge of the essential terms of the PP&L-Ebasco contract; (3) PP&L has failed to prove that GE intended to harm it via its actions in connection with Supplement 16; [49] (4)PP&L has failed to prove that it sustained harm in conjunction therewith; and (5) GE has established by a preponderance of the evidence that it acted with reasonable justification and privilege.

E. *The Contract Issues (Including U.C.C. § 2–207): What Were the Terms of the Turbine-Generator Contract Before Issuance of Supplement 16? Do Ebasco's Standard Supplementary Terms and Conditions Exclude Recovery for Cost of Replacement Power?*

1. *Was there a U.C.C. § 2–207 Contract?*

The contract issue that dominated our opinion in *Ebasco I* was the construction of U.C.C. § 2–207; indeed, a major portion of that opinion was devoted to an explication of this enigmatic section of the Code. The discussion was responsive to PP&L's contention, noted in the Preliminary Statement to this opinion, that it obtained a contract on Ebasco standard terms via § 2–207 by virtue of the GE quotation of July 15, 1964 (referencing GE Handbook terms), the Ebasco letter of intent of July 21, 1964 (referencing Ebasco standard terms), and events occurring thereafter but before October 26, 1967, the date on which Supplement 16 was negotiated (or perhaps we should say events *not* occurring thereafter, because PP&L relies most on GE's failure to take exception to the July 21, 1964 letter).[50]

---

49. *See Behrend v. Bell Telephone Co.*, 242 Pa. Super. 47, 363 A.2d 1152 (1976).

50. GE contends that the U.C.C. does not apply to this case because New York law applies and because the U.C.C. did not become effective in New York until September 27, 1964, some two months after the Cox-Bonin conversation and the initial exchange of letters between GE and Ebasco. We find the contention that the U.C.C. does not apply under New York law to be without merit. With respect to transactions that span the effective date of the U.C.C., Professor Anderson has noted:

It is likely that the courts will tend to determine whether the dominant or major part of the relationship occurred before or after the effective date and will apply the law then existing to the entire relationship, even though some part of the relationship was in fact on the other side of the temporal boundary line.

4 Anderson, *Uniform Commercial Code* § 10–101:7 (1971)

In *Ohio Brass Co. v. Allied Products Corp.*, 339 F.Supp. 417 (N.D.Ohio 1972), the court concluded that a breach of contract action for defective equipment was subject to the Code's statute of limitations period even though the contract was entered into before the effective date of the Code in Ohio because delivery of the equipment took place after the Code became effective. In *Safeway Stores, Inc. v. L. D. Schreiber Cheese Co.*, 326 F.Supp. 504 (W.D. Mo.1971), the court applied the Code's provision concerning the warranty of merchantability to a pre-Code sale of cheese where the manufacture and delivery of the cheese occurred after the effective date of the Code in Missouri. And a promissory note that was amended in part after the effective date of the Code was held to be governed in its entirety by the Code, even though the original note had been executed before the Code went into effect. *A. J.*

Because of the paucity of case law construing that most difficult section of the Code [51] and the absence of definitive case law in Pennsylvania and New York, the only two states that may be said to control, we cannot be confident of the correctness of the interpretation we adopted in *Ebasco I*; *i. e.*, our election to follow the rule of *Dorton v. Collins and Aikman Corp.*, 453 F.2d 1161 (6th Cir. 1972), and to reject the rule of *Roto-Lith, Ltd. v. F. P. Bartlett & Co.*, 297 F.2d 497 (1st Cir. 1962).[52] We need not, however, engage in another lengthy exegesis of § 2–207, nor need we assay the entire record in § 2–207 terms. That is because our factual findings negate the existence of a § 2–207 contract giving PP&L rights that might be diluted by Supplement 16. Some of those facts at the same time destroy PP&L's alternate claim that, even without regard to § 2–207, there was an express contract on Ebasco terms.

■ The first and most important finding in this regard relates to the Cox-Bonin telephone conversation of July 15, 1964. We have found that Cox and Bonin agreed to a contract on GE Handbook (§ 4710) commercial terms, and we have stated our reasons for so finding (our estimate of Cox's credibility and the matter of a $600,000 price differential between the Westinghouse and GE quotations). A contract on GE terms itself precludes the possibility of a § 2–207 contract on Ebasco standard terms. *See* Comment 1 to U.C.C. § 2–207, *discussed in Ebasco I*, 402 F.Supp. at 439. Of the two situations with which, according to Comment 1, § 2–207 is intended to deal, the only one even arguably applicable here is "the written confirmation, where an agreement has been reached . . . orally . . . and is followed by one or both of the parties sending formal memoranda embodying the terms so far as agreed upon and adding other terms *not discussed*" (emphasis added). That is not what happened in this case, for the Ebasco letter of intent sent by Salerno on June 21, 1964 contradicts the terms that were agreed upon between Cox and Bonin.[53]

■ Secondly, we have found that GE notified Ebasco of its objections to Ebasco terms within a reasonable time. This finding prevents Ebasco's standard terms from becoming part of the contract under § 2–207(2)(c), even assuming that a § 2–207(1) contract was cognizable.[54] We have explained in our findings of fact the basis for

*Armstrong Co., Inc. v. Janburt Embroidery Corp.*, 97 N.J.Super. 246, 234 A.2d 737 (1967). *See also, Humble Oil & Refining Co. v. Copley*, 213 Va. 449, 192 S.E.2d 735 (1972) (U.C.C. applies to demand note executed before effective date of Virginia U.C.C. because events and transactions that precipitated the demand for payment and made the note actionable occurred after the U.C.C. had become effective); *August v. Poznanski*, 383 Mich. 151, 174 N.W.2d 807 (1970) (U.C.C. applicable where mortgagee took possession of goods one month before U.C.C. became effective in Michigan because question of priorities of creditors of mortgagor did not arise until after effective date).

We find that in the present case, the provisions of the U.C.C. are applicable *to the entire* contractual relationship. After the U.C.C. went into effect in New York, the parties supplemented and amended the terms of the July 15, 1964 conversation and of the letters that it generated. Moreover, virtually the entire performance of the contract took place after September 27, 1964. As in *Ohio Brass, supra*, and *Safeway Stores, supra*, the basis of PP&L's claim against GE concerns deficiencies in GE's performance which occurred after the effective date of the U.C.C. in New York.

**51.** *See Ebasco I*, 402 F.Supp. at 436 n. 18, citing cases that have referred to § 2–207 variously as a "murky bit of prose" and "not too happily drafted," and citing a treatise referring to it as "one of the most important, subtle, and difficult in the entire code," and stating that "the product as it finally reads is not altogether satisfactory."

**52.** Neither do we see any reason to reconsider that holding.

**53.** We need not engage in an extended discussion of the GE Handbook terms. As we read them, they foreclose a claim for cost of replacement power. If they did not do so on their face, they would as interpreted in light of our findings of fact on trade custom, the course of dealing between GE and Ebasco, and the law on direct versus consequential damages, *see* discussion of both matters *infra*.

**54.** In 2–207(2) terms, we have not suggested that Ebasco's July 21, 1964 letter expressly limited acceptance to its terms. Moreover, in view of our findings of fact *supra* and our discussion of the Ebasco terms as construed in light of trade usage and the course of dealing of the parties, we could not say that they materially altered the contract.

the conclusion that notification was within a reasonable time.

■ The final § 2–207 possibility is a contract under § 2–207(3). That section provides:

Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this Act.

PP&L has argued that even if we should find that the Ebasco standard terms did not become part of the Brunner # 3 contract, we should nonetheless find a 2–207(3) contract incorporating U.C.C. provisions in lieu of the otherwise missing terms. In support of its contention PP&L argues as follows:

Focusing on April 1967, the commitments by Ebasco and GE to each other with regard to the turbine-generator and the boiler feed pump turbines, and the commitments by both of them to PP&L, were such that it would be inconceivable that any court, hearing a case of refusal to proceed by either GE or Ebasco at that time, would have held that there was no contract. As the Court points out in its Opinion at 402 F.Supp. 435–36, the difficult question is not whether there was a contract but rather what the terms of the contract were. Some of the terms are easy. Even GE witnesses are expected to admit at trial that, as of July 15, 1964, the price level was firm for shipment within three years. In fact, this is specifically stated even in the original GE quotation letter.

Secondly, there will be undisputed evidence that there was a firm shipment date as of April 1967, and, in fact, notification of a four month delay in that date, from June to October 1967, because of the Schenectady strike, was given by GE on April 1, 1967. And trial evidence will demonstrate that Ebasco protected its rights to the earlier shipment date in acknowledging this notification.

PP&L Trial Brief at 154–55. (footnote omitted) PP&L goes on to discuss other points on which the parties were agreed as of mid-1967. The "bottom line" of the argument is that the missing term—the limitation of liability clause—is to be supplied by the Code. And, of course, the U.C.C. contains no provisions limiting the liability of a supplier for consequential damages.

We are reminded at this juncture of the comments by Professors White and Summers to the effect that § 2–207 has been pressed into service, not as was originally intended—to "keep the welsher in the contract"—but rather to decide the terms of the contract after documents have been exchanged or performance has begun. *See Ebasco I,* 402 F.Supp. at 435–36. PP&L is invoking the spectre of a refusal by GE to deliver the turbine generator in an effort to have us declare, via § 2–207(3), commercial terms of the contract. Although this is a clever approach, § 2–207(3) simply does not fit here, for while a refusal to deliver might have caused us to invoke § 2–207(3) to enforce delivery, that is not what happened.[55] GE does not dispute the existence of a contract, but only the contract's terms. Moreover, PP&L's § 2–207(3) argument must fail because its premise fails. For, as we have seen, there was in the Cox-Bonin conversation agreement on the commercial terms, and those terms were not Ebasco's. Additionally, even if there had not been such express agreement, rather than the Code controlling, a limitation clause preventing recovery for cost of replacement power would be supplied by the course of dealing between the parties (*i. e.,* the parties' understanding of Ebasco's standard terms) and trade usage.

---

**55.** Salerno knew it would not happen because of the staggering loss GE would sustain, hence his "hard line."

2. *Do the Ebasco Standard Terms Prevent Recovery for Cost of Replacement Power?*

(a) *Limitation of Recovery on the Breach of Contract Claim.*

We have by our findings and the foregoing discussion firmly rejected the notion that there was, without reference to § 2–207, a steam turbine generator contract on Ebasco terms. The foregoing discussion also makes clear that there was no § 2–207 contract for the steam turbine generator on Ebasco terms. However, that conclusion does not signal the end of our analysis. For it is important that we also analyze the Ebasco standard terms—on their face, in light of trade usage and understanding, and according to the course of dealing between GE and Ebasco—to determine their import. We obviously must do so to determine if GE can be liable to PP&L for cost of replacement power on those Brunner # 3 contracts that did not involve the steam turbine generator, since those contracts were premised on Ebasco standard terms. Additionally, that analysis will determine whether Supplement 16 represented a "downward" negotiation and whether GE was harming (or, intending to harm) PP&L in obtaining Supplement 16. It will, concomitantly, shed light on the existence and nature of a quid pro quo.[56] The question is not totally free from difficulty, particularly as respects the question whether PP&L can proceed on claims for breach of implied warranty, negligence, and strict liability (Restatement (Second) of Torts § 402(A)[57]).

We turn first to the question whether the Ebasco standard terms exclude recovery for cost of replacement power on a contractual theory and then to the question whether they similarly limit recovery on the theories of negligence or strict liability. PP&L's argument that Ebasco standard terms do not exclude its claim for cost of replacement power requires us to analyze two provisions of the Ebasco standard terms, Articles 16 and 17.[58] We rescribe Article 16, entitled "Guarantee,"

The Seller warrants to the Purchaser and the Owner that all Equipment furnished under this Order shall be free from defects either in design, material or workmanship and shall be suited in all respects both for the purposes for which it is specified hereunder to be sold and for all other uses for which it may be represented in writing by the Seller to be suited. The Seller also warrants to the Purchaser and the Owner the successful operation of all such Equipment. The Seller shall not be required to correct any defects which may appear in such Equipment after one year from the date it is first put into service, such service to begin within a reasonable time after the delivery of such Equipment. Except to the extent hereinafter in this paragraph otherwise provided, the Seller's liability *under this Article No. 16* shall in no case (except as to implied warranty of title) exceed the cost of repairing, or of supplying a replacement for, any defective parts or materials. If the Equipment furnished under this Order is installed by the Seller and any defect or defects in design, material or workmanship appears within the period of time in this paragraph above set forth, then, in addition to repairing, or furnishing a replacement for, any defective parts or materials, the Seller shall negotiate with the Purchaser and/or the Owner as to the extent of the additional burden or responsibility, if any, that Seller shall assume in completely and satis-

---

**56.** The analysis would also be relevant to determining whether reference to Ebasco standard terms constituted a "material alteration" within the meaning of § 2–207(2)(b). *See* note 54 *supra.* That would be a most important consideration but for our rejection of § 2–207's applicability on other grounds.

**57.** We observe that both Pennsylvania and New York have adopted Restatement (Second) of Torts § 402A. *See, e. g., Webb v. Zern*, 422 Pa. 424, 220 A.2d 853 (1966); *Coddling v. Paglia*, 32 N.Y.2d 330, 345 N.Y.S. 461, 298 N.E.2d 622 (1973).

**58.** PP&L also invoked Article 20, which is the "integration" clause of the final contract.

factorily correcting any such defect or defects.

The warranties in this Article No. 16 contained assume that the Equipment furnished under this Order, if not installed by the Seller, is properly installed, and that such Equipment is properly used and maintained. (emphasis added).

PP&L's argument that Article 16 does not exclude liability for cost of replacement power is best advanced by quoting from its trial brief:

The language of Article 16 makes clear the limited situation to which it is addressed. It furnishes a remedy for "defects either in design, material or workmanship" for "all Equipment furnished under this Order" if the defects appear within one year after initial service. Although the Article also speaks of suitability of Equipment for purposes for which it is specified and of warranting successful operation of Equipment, there is no limit to the remedy under the Article except in situations where there are "defective parts or materials." (*See* UCC § 2–719(2), providing that an exclusive remedy is not effective if it fails of its essential purpose.) Article 16 then goes on to limit the Seller's liability "under this Article 16" to "the cost of repairing, or of supplying a replacement for, any defective parts or materials."

Of course, in arguing that Article 16 provides the exclusive remedy for breach of all contract provisions, GE, CE and Foster Wheeler completely ignore the language "under this Article No. 16." As previously discussed, the suppliers have the burden of demonstrating that Article 16 clearly, precisely and unequivocally provides that it is the exclusive remedy for breach of all contract provisions. The interpretation of Article 16 put forth by the suppliers fails to satisfy this standard. It is difficult, if not impossible, to find a clear and unequivocal intention to limit damages for breach of *all* contract provisions in language which specifically states that the limitation provided only affects

Seller's liability "under this Article No. 16."

PP&L Trial Brief at 44–45 (emphasis in original) (footnote omitted).

The question before us, of course, is not what constitutes a breach of the contract between PP&L/Ebasco and GE, but what damages are recoverable assuming a breach. Before considering the possible scope of liability under Article 16, we make a necessary threshold observation. Although we think that PP&L is correct that the textual fabric of Article 16 restricts the applicability of the article's limitation of liability provisions to matters warranted under ("this") Article 16 and is not sufficiently broad to cover breach of all contract provisions (*e. g.*, delay in delivery), we think that PP&L's interpretation of the scope of the Article 16 remedy limitations may be unduly restrictive. PP&L asserts that Article 16's limitations apply only when the breach consists of "defective parts or materials." It would appear, however, that by its own terms Article 16 applies to all situations in which there are operational flaws in the equipment, whatever the cause of the operational inadequacy, and that the limitations contained in Article 16 apply to all such situations of "the Seller's liability under this Article No. 16."

Turning to more crucial matters, we record our disagreement with PP&L's position that in those areas in which the Article 16 limitations of liability do apply, the limitation is insufficient to exclude cost of replacement power. If Article 16 stood alone for adjudication, we might well have to construe it in the manner PP&L urges. *But see* notes 62–64 *infra*. Article 16 does not, however, stand alone. One of the major purposes of the trial that we conducted on the contractual issues was to develop evidence of the course of dealing among the parties and of trade custom and understanding on the issues of (1) the liability of the parties for cost of replacement power, and (2) the meaning of the Ebasco standard terms. As our findings of fact demonstrate, the trial illuminated those matters

extensively. Hence, in confronting the question whether Article 16 effectively limits GE's liability for cost of replacement power, we do not view Article 16 in a vacuum, but against a substantial factual background.

It is important at the outset to consider the text of U.C.C. § 2–719, which provide as follows:

(1) Subject to the provisions of subsections (2) and (3) of this section and of the preceding section on liquidation and limitation of damages,

(a) the agreement may provide for remedies in addition to or in substitution for those provided in this Article and may limit or alter the measure of damages recoverable under this Article, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of non-conforming goods or parts; and

(b) resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.

(2) Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this Act.

(3) Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not.

Section 2–719 thus permits the "agreement" of the parties to provide for limitation of recoverable damages. "Agreement" is defined in § 1–201(3) of the U.C.C. as follows:

"Agreement" means the bargain of the parties in fact as found in their language or by implication from other circumstances *including course of dealing or usage of trade* or course of performance as provided in this Act (Sections 1–205 and 2–208). (emphasis added)

The content and import of "course of dealing" and "trade usage" is best conveyed by the U.C.C.'s own explication of these terms:

(1) A course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

(2) A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question. . . .

(3) A course of dealing between parties and any usage of trade in the vocation or trade in which they are engaged or of which they are or should be aware give particular meaning to and supplement or qualify terms of an agreement.

U.C.C. § 1–205.

Thus, the "agreement" between GE and PP&L on limitation of liability, via Ebasco's standard terms, is not just the stark words of Article 16, but is those words as construed in the commercial setting in which they arose and were used. The course of dealing and trade usage supplement, qualify, and explain the meaning of the Ebasco standard terms. We note in this regard *Posttape Associates v. Eastman Kodak Co.,* 537 F.2d 751 (3d Cir. 1976), which explored the relationship between limitation of remedies under § 2–719 and the agreement of the parties according to § 1–201(3). Speaking for the court, Judge Weis observed:

That a party is bound by a trade usage of which he "should be aware" implies that a limitation of damages may be imposed even if the parties did not explicitly and expressly negotiate it. The totality of the agreement, however, must include a provision, present in the trade usage, or otherwise expressed, that the limited remedy is an exclusive one. § 2–719(1)(b). *See* 1 R. Anderson Uniform Commercial Code § 2–719:7 (1970, Supp. 1975). . . .

537 F.2d at 756 (footnote omitted).

■ We have made findings of fact about the course of dealing between GE and Ebasco, which in turn subsumes the important matter of the understanding of the parties as to the meaning of the Ebasco standard terms. We have also made extensive findings about the trade usage of which the contracting parties were aware. It would be time consuming and redundant to repeat those findings here, but it will be helpful at least to summarize the salient points.

First, we have found that Ebasco had told GE that its standard terms did not impose liability on GE for cost of replacement power. Second, we have found that Ebasco repeated this statement to other power generation equipment suppliers. Third, PP&L knew this to be the case. Thus, none of the contending parties understood or expected that Ebasco standard terms would subject GE to liability for cost of replacement power. Fourth, the trade custom at times relevant here was that suppliers were not deemed liable for cost of replacement power.[59] In accordance with these findings, we conclude that the course of dealing and trade usage at issue established a common basis of understanding for interpreting the meaning of the Ebasco terms.

We acknowledge the terms of § 1–205(4), which provides:

(4) The express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other; but when such construction is unreasonable express terms control both course of dealing and usage of trade and course of dealing controls usage of trade.

However, we find it reasonable to construe the express terms of Article 16, which limits sellers liability to the cost of replacement and repair, to be consistent with the course of dealing and trade usage.[60] We have found trade usage to exist notwithstanding some minimal erosion thereof. But there was no erosion of the parties' own historically based understanding of the Ebasco standard terms, and, under U.C.C. § 1–205(4), course of dealing prevails even over trade usage.

Moreover, we are in any event satisfied that the language of Article 16 providing that "the Seller's liability under this Article 16 shall in no case . . . exceed the cost of repairing, or of supplying a replacement for, any defective parts or materials" is sufficiently explicit to render the remedies provided by the article to be Buyer's exclusive remedy for operational failure (except as the article itself otherwise provides). *See* U.C.C. § 2–719(1)(b) ("resort to a remedy is optional unless the remedy is

---

**59.** We have adverted above to the fact that there were some irregularities in the fabric of the trade custom, but not enough to rend the garment. We note in this regard the official comment to U.C.C. § 1–205, ¶ 5. There it is pointed out that the failure of some merchants to follow a custom does not nullify its validity. Paragraph 5 in its entirety reads as follows:
A usage of trade under subsection (2) must have the "regularity of observance" specified. The ancient English tests for "custom" are abandoned in this connection. Therefore, it is not required that a usage of trade be "ancient or immemorial," "universal" or the like. Under the requirement of subsection (2) full recognition is thus available for new usages and for usages currently observed by the great majority of decent dealers, even though dissidents ready to cut corners do not agree. There is room also for proper recognition of usage agreed upon by merchants in trade codes.

**60.** It is important to note that the evidence about what PP&L, Ebasco, and GE understood and intended is not parol evidence, contradicting a written (integrated) agreement, but rather is evidence probative of the circumstances surrounding the transaction. Such evidence aids in interpreting the intent of the parties and the meaning of their agreements. Judge Van Dusen put it well:
The courts of Pennsylvania have held that contracts must receive a reasonable interpretation according to the intention of the parties and, to determine that intention, the court may consider the situation of the parties, the objects they apparently had in view, the nature of the subject matter of the agreement, and the surrounding circumstances. *Winter v. Welker*, 174 F.Supp. 836, 842 (E.D. Pa.1959).

expressly agreed to be exclusive, in which case it is the sole remedy").

When we construe Article 16 in light of the foregoing considerations we conclude: (1) that Article 16 does indeed limit PP&L's remedies to requiring GE to perform the undertakings set forth therein, principally replacement and repair (cf. U.C.C. § 2–719(1)(a), providing that replacement and repair is an allowable limitation); and (2) that, concomitantly, Article 16 does not permit recovery of cost of replacement power on PP&L's contract claim.

■ PP&L contends that construing Article 16's limitations to limit recovery to repair or replacement for all operational failures under the warranty would in some situations leave the buyer altogether remediless, thus causing Article 16 to fail of its essential purpose and triggering U.C.C. § 2–719(2) ("Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this Act."). For example, PP&L argues, when the operational fault is not due to a defective part but to some other cause, then repair or replacement would be an inadequate—indeed totally ineffective—remedy. In such circumstances, and it is PP&L's contentions that such circumstances exist here, if Article 16 means what we have said it does, then PP&L would posit that Article 16 must be voided by the remedy preserving caveat of § 2–719(2).[61]

It cannot be gainsaid that § 2–719(2) protects a buyer from being left wholly without remedy. "If the parties intend to conclude a contract for sale within this Article they must accept the legal consequence that there be at least a fair quantum of remedy for breach of the obligations or duties outlined in the contract." U.C.C. § 2–719, Comment 1. We think, however, that PP&L's "failure of essential purpose"

argument is unavailing, for Article 16 itself provides a built in mechanism for expanded liability in unprovided for situations:

If the Equipment furnished under this Order is installed by the Seller and any defect or defects in design, material or workmanship appears within the period of time in this paragraph above set forth, then, in addition to repairing, or furnishing a replacement for, any defective parts or materials, the Seller shall negotiate with the Purchaser and/or the Owner as to the extent of the additional burden or responsibility, if any, that Seller shall assume in completely and satisfactorily correcting any such defect or defects.

At this stage of the proceedings, of course, we do not attempt to decide the total scope of the seller's undertaking under Article 16 (GE may indeed have to take on additional burdens beyond replacement and repair in order to completely correct any defects), but only that Article's adequacy to disclaim cost of replacement power as a recoverable item of damage.

Moreover, it is clear to us that § 2–719(2) cannot be applied in the abstract, but only in light of concrete—and established—"circumstances." The question is not whether in some circumstances the limited remedy might fail of its essential purpose, but whether in the specific circumstances of this case there is such failure. In other words, did the situation develop in such a way that the real or legally presumed intent of the parties to provide *some* remedy would be frustrated if the limitation of remedy clause were to be applied? Professors White and Summers have explicated § 2–719(2) as follows:

[This provision] is not concerned with arrangements which were oppressive at their inception, but rather with the application of an agreement to novel circumstances not contemplated by the parties.

White & Summers, U.C.C. 380 (1972).

N.Y.S.2d 541 (Sup.Ct.1972); *and Architectural Aluminum Corp. v. Macarr, Inc.*, 70 Misc.2d 495, 333 N.Y.S.2d 818 (Sup.Ct.1972); *with Granite Worsted Mills, Inc. v. Aaronson Cowen, Ltd.*, 29 A.D.2d 303, 237 N.Y.S.2d 765 (App. Div.1968) *and Steele v. J. I. Case Co.*, 197 Kan. 554, 419 P.2d 902 (1966).

**61.** PP&L concedes that U.C.C. § 2–719(3) is not applicable here and that even if Article 16 be construed as we have done, the resulting contract provision is not unconscionable. PP&L's position seems clearly correct on the law. *Compare U. S. Fibres, Inc. v. Proctor & Schwartz, Inc.*, 509 F.2d 1043 (6th Cir. 1975); *Bakal v. Burroughs Corp.*, 74 Misc.2d 202, 343

PP&L has made no showing which demonstrates that the limited remedy of Article 16 has failed of its purpose under the specific circumstances here.

■■■■■ In ¬um, we are satisfied that the parties intended to exclude cost of replacement power as a recoverable damage for operational failure and that Ebasco's standard Article 16 is sufficient to do so under U.C.C. § 2–719 as respects PP&L's contract claim. The parties have devoted much effort to disputing whether cost of replacement power is a general or consequential damage [62] and to arguing whether,

---

62. We adverted in *Ebasco I* to the question whether, in the context of the GE-Ebasco contracts, cost of replacement power is a general or special damage:

> That distinction [between general and special damages] is not a clear one and would turn on what damages were contemplated by the parties at the time the contract was entered. *See, e. g., Kaufman v. Gordon,* 24 Misc.2d 240, 197 N.Y.S.2d 1013, 1020 (1960), *aff'd,* 10 N.Y.2d 769, 219 N.Y.S.2d 614, 177 N.E.2d 54 (1961); *cf. Kerr S. S. Co. v. Radio Corp. of America,* 245 N.Y. 284, 157 N.E. 140 (1927).

402 F.Supp. at 429 n. 6.

Because the DELAY provision makes Seller liable only for general damages or special damages specifically referred to in the purchase order, and because cost of replacement power is not mentioned as a special damage in the purchase order, the parties have extensively briefed the question of whether cost of replacement power is a general or special damage. In light of our determination that the limitation of liability clause in Supplement 16 bars any recovery of cost of replacement power whether as a general or special damage, we need not reach this problem. Were the question before us, we doubt the propriety of resolving it on a motion for summary judgment in light of the essentially factual determination that must be made as to the damages foreseen by the parties at the time of contracting. *See, e. g., Spang Ind., Inc. v. Aetna Cas. & Sur. Co.,* 512 F.2d 365 (3d Cir. 1975). *Cf. Globe Refining Co. v. Landa Cotton Oil Co.,* 190 U.S. 540, 23 S.Ct. 754, 47 L.Ed. 1171 (1903); *New York Water Service Corp. v. City of New York,* 4 A.D.2d 209, 163 N.Y.S.2d 538 (1957).

402 F.Supp. at 433 n. 14.

Although we need not decide the question, the vigorous briefing of the question and the importance to Article 17 of the distinction between general and consequential damages leads us to make the following observations.

The most famous case contrasting general and special (or consequential) damages is *Hadley v. Baxendale,* 9 Ex. 341, 156 Eng.Rep. 145 (1854). In that case, a miller contracted with a carrier to transport a broken crankshaft to the manufacturer for repairs. The carrier was told that the shaft was part of the milling machinery and that it must be sent at once. He was not told that the mill could not operate without the shaft. The carrier failed to transport the shaft as soon as agreed, and the miller sought to recover the profits the mill would have earned but for the unnecessary delay caused by the absence of the crankshaft. The court held that loss of profits was not recoverable, for the stoppage of the mill was not a reasonably foreseeable result of the carrier's breach of contract. *Hadley v. Baxendale* thus established the general proposition that a party is liable only for those damages that a reasonable man would expect to follow the breach of a particular contract—i. e. the natural and probable consequences—unless it is shown specifically that the defendant had reason to know of the circumstances responsible for the special damage and so to foresee the injury.

Although the primary issue in *Hadley* was recoverability, the case also offered guidance on categorization. That is, *Hadley* focused on the foreseeability necessary in order to recover consequential damages, but in doing so it characterized general and consequential damage. Under *Hadley* and the contract case law that has followed it, ordinariness or directness in the usual case is the hallmark of a general or direct damage; presence of peculiar circumstances signals special or consequential damages. Foreseeability is a requirement for recovery in any case. *See* Restatement of Contracts § 330; 5 Corbin, Contracts §§ 1007, 1011 (1964 ed.); 11 Williston, Treatise on the Law of Contracts §§ 1344, 1345A (3d (Jaeger) ed.).

We have no difficulty concluding that the cost of replacement power is a consequential damage for breach of warranty in the supply of power generating equipment. The ordinary measure of damages for breach of warranty under the Code is the difference between the value of the goods as warranted and as actually delivered. U.C.C. § 2–712(2). It seems to us that the structure of the Code suggests that in most cases (*i. e.,* barring "special circumstances," U.C.C. § 2–714(2)) this difference in value will be the general damage for breach of warranty under the Code, whereas expenses incurred as a result of the breach are either incidental or consequential. *Cf. Petroleo Brasileiro, S. A., Petrobras v. Ameropan Oil Corp.,* 372 F.Supp. 503, 508 (E.D.N.Y.1974) (contrasting seller's incidental and consequential damages: "consequential damages do not arise within the scope of the immediate buyer-seller transaction, but rather stem from losses in-

when characterized as one or the other, it would be recoverable under either the law of Pennsylvania,[63] or that of New York.[64] Our reading of Article 16, however, moots

curred by the non-breaching party in its dealings, often with third parties, which were a proximate resu't of the breach"). Both Pennsylvania and New York have traditionally considered expenses incurred or gains prevented beyond the immediate buyer-seller transaction to be consequential damages. *See, e. g., Macchia v. Megow*, 355 Pa. 565, 50 A.2d 314 (1947); *Czarnikow-Rionda Co. v. Federal Sugar Refining Co.,* 255 N.Y. 33, 43, 173 N.E. 913, 915–16 (1930). In situations similar to the one before us other courts have found cost of replacement power, as an expense beyond the difference in value, to be a consequential damage. *See American Electric Power Co. v. Westinghouse Electric Corp.,* 418 F.Supp. 435, 459–60 & n. 44 (S.D.N.Y.1976) ("Clearly, any items of increased costs incurred as a consequence of the breach will be considered as consequential damages."); *Potomac Electric Power Co. v. Electric Corp.,* 385 F.Supp. 572, 579 (D.D.C. 1974) ("in any event the Court considers any increased costs as consequential damages under § 2–715 of the Code"). Moreover, our findings of fact demonstrate that the parties themselves considered cost of replacement power to be a consequential damage.

**63.** We have found cost of replacement power to be excluded as recoverable damages under Article 16 whether such cost is a general or consequential damage. Even without that finding, however, at least under Pennsylvania law our conclusion that cost of replacement power is a consequential damage, *see* note 62 *supra,* would, under the facts of this case, preclude recovery of that cost by PP&L. This is so for at times relevant to this case Pennsylvania law limited the recovery of consequential damages to those cases in which there was (1) not only reason to foresee the special damage sought, but (2) there was also actual contemplation of assuming liability for such damages in the negotiation of the terms of the contract, and (3) the parties contemplated that the liability was being assumed. *Keystone Diesel Engine Co. v. Irwin,* 411 Pa. 222, 191 A.2d 376 (1963); *Macchia v. Megow,* 355 Pa. 565, 50 A.2d 314 (1947); *Taylor v. Kaufhold,* 368 Pa. 538, 84 A.2d 347 (1951). In *Keystone,* the court held that consequential damages could not not be recovered when they were not specifically contemplated as an element of recoverable damages in the event of breach:

There is no doubt that in a contract of this nature a breach causing malfunction of the engine would produce a halt in productive capacity and some damage could flow therefrom. Moreover, there would be no difficulty in measuring these damages with reasonable accuracy. *The real issue is whether the damages sought* for loss of profit *were within the contemplation of the parties* to the contract

here in dispute. 411 Pa. 222, 224, 191 A.2d 376, 378 (1963). (emphasis added).

Thus, Pennsylvania requires specificity if notice of special circumstances is to be an adequate basis for charging the defendant with the assumption of liability for the special damages.

[T]he buyer [must have] communicated to the seller at the time of entering into the contract sufficient facts to make it apparent that the damages subsequently claimed were in the reasonable contemplation of the parties.

*Keystone Diesel, supra,* at 225, 191 A.2d at 278. In *Macchia v. Megow,* 355 Pa. 565, 50 A.2d 314 (1947), the defendant knew that the parts he was supplying were to be used to make tools for another contract. He had no knowledge of the specific terms of the buyer's other arrangement, nor of the existence of a letter from the third party to the buyer stressing the importance of the buyer's compliance with the schedule of deliveries. The Court held that the defendant's general knowledge was insufficient to hold the defendant liable for consequential damage in the form of lost profits. *See also Popkin Bros. v. Dunlap,* 130 Pa.Super. 50, 196 A. 586 (1938); *Tri-State Mac. Tools v. Roco-Manser, Inc.,* 47 D. & C.2d 357 (1969).

In sum, in Pennsylvania,

. . . mere notice to a seller of some interest or probable action of the buyer is not enough necessarily and as a matter of law to charge the seller with special damage on that account if he fails to deliver the goods. *Globe Refining Co.,* 190 U.S. 540, 545, 23 S.Ct. 754, 47 L.Ed. 1171 (1903).

As we read the record, Pennsylvania law as just set out would prohibit recovery of cost of replacement power as a consequential damage. The record contains no evidence that would support a finding that GE contemplated or tacitly agreed to be liable for cost of replacement power (quite to the contrary, the evidence is that the parties agreed that GE would *not* be liable for cost of replacement power). Such a "tacit agreement" would be highly unlikely especially in view of the factors recited *supra,* note 28 (a) & (b), relating to the inevitability of outages and the huge risk involved, and our findings of fact on the cost of replacement power. These findings related to the enormous variability of the cost of replacement power, particularly the inability of the utilities themselves to predict it because of the complexity of the factors involved—complexity that makes cost of replacement power meaningfully determinable only retrospectively. Further, the principal factors affecting the cost of replacement power (installed capacity, maintenance schedule, load forecast, size of unit, type of unit, and forced outage prediction) are within

**64.** See note 64 on page 216.

the control of the utility, making such cost an inappropriate item for general damages.

The Pennsylvania Supreme Court emphasized the commercial necessity underlying this rule in *Macchia, supra:*

"Parties, when they enter into contracts, may well be presumed to contemplate the ordinary and natural incidences and consequences of performance or non-performance; but they are not supposed to know the condition of each other's affairs, nor to take into consideration any existing or contemplated transactions not communicated nor known, with other persons. Few persons would enter into contracts of any considerable extent as to subject matter or time if they should thereby incidentally assume responsibility of carrying out, or be legally held affected by other arrangements over which they have no control."

355 Pa. 565, 569–570, 50 A.2d 314, 316 (1947) (quoting *Sutherland on Damages* (4th ed.). *See Motif Construction Corp. v. Buffalo Savings Bank,* 50 A.D.2d 718, 374 N.Y.S.2d, 868 (1976).

Compounding the problem here is the fact that the tremendous growth in demand for electric power between 1964 and 1968–70 (the period for which PP&L seeks damages) was so much greater than expected that it was unforeseeable. Obviously, the fact that GE could not compute precisely the *amount* of certain possible damages prospectively does not prove that such damages were not "contemplated" by the parties as a *type* of damages. But the extraordinarily variable and significantly uncontrollable (at least from GE's perspective) nature of cost of replacement power would make it a highly unlikely item of contemplated or tacitly agreed to damages; such wildly unpredictable exposure is just not the sort of liability a commercially knowledgeable corporation like GE undertakes "tacitly" in the face of trade custom to the contrary.

We note our awareness that *Keystone Diesel* was overruled by Pennsylvania Supreme Court in *R. I. Lampus Co. v. Neville Cement Products Corp.,* 474 Pa. 199, 378 A.2d 288 (1977). In *Lampus,* the court described the two contending tests for consequential damages in the words of Professors White and Summers:

"The more restrictive or 'tacit-agreement' test permits the plaintiff to recover damages arising from special circumstances only if 'the defendant fairly may be supposed to have assumed consciously, or to have warranted the plaintiff reasonably to support that it assumed [such liability] when the contract was made.' [*Globe Refining Co. v. Landa Cotton Oil Co.,* 190 U.S. 540, 544 [23 S.Ct. 754, 47 L.Ed. 1171] (1903).] In effect, this test requires the plaintiff to prove that the parties had specifically contemplated that consequential damages might result and that the defendant actually assumed the risk of

such damages. The other group of cases, and certainly the recent trend of authority, has rejected this test. As Professor Corbin said:

All that is necessary, in order to charge the defendant with the particular loss, is that it is one that ordinarily follows the breach of such a contract in the usual course of events, or that reasonable men in the position of the parties would have foreseen as a probable result of breach." [5.A. *Corbin. Corbin on Contracts* § 1010 at 79 (1964).]

White & Summers, U.C.C. 316 (1972) (footnotes omitted).

The court concluded that the "special circumstances" requirement of § 2–714(2) was unrelated to the recovery of consequential damages provided for in § 2–715(2). The court observed that *Keystone Diesel* was out of harmony with the Code, and while not *expressly* overruling it, there can be no doubt that by following the "reason to know" test, the *Lampus* court did overrule *Keystone Diesel.*

We need not, however, be concerned with the impact of *Lampus,* for it may not be retroactively applied to the facts at bar. The rule followed by the Pennsylvania courts in determining whether to give retroactive effect to newly declared principles of civil law, *see Schreiber v. Republic Intermodal Corp.,* 473 Pa. 1, 375 A.2d 1285 (1977), is that announced by the U. S. Supreme Court in *Chevron Oil Company v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971):

First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied . . . or by deciding an issue of first impression whose resolution was not clearly foreshadowed . . . . Second, it has been stressed that "we must . . . weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." Finally, we [must] weigh the inequity for "[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the "injustice or hardship" by a holding of nonretroactivity."

404 U.S. at 106–07, 92 S.Ct. at 355 (citations omitted).

The third criterion is dispositive for us. To apply retroactively a rule of commercial law that overrules a principle that had stood for scores of years and on which parties to commercial dealings relied and had a right to rely would be most inequitable. The parties to this case negotiated substantial contracts in which matters of general versus special damages were important considerations. It would be unreasonable to apply to their undertakings, whatever they may have been, a totally differ-

ent rule of damage liability from that within their ken at the time of their dealings. *Cf. Kacher v. Pittsburgh National Bank,* 545 F.2d 842 (3d Cir. 1976).

**64.** We assume here, *see* note 62 *supra,* that cost of replacement power is a consequential damage for breach of warranty. New York law was, until the advent of the U.C.C., similar to that of Pennsylvania. *See* note 63 *supra.* That is, it was the law in New York that: (1) notice to the defendant of special circumstances is necessary to render him liable for special or consequential damages; and (2) the notice must have been conveyed to him at the time of or prior to contracting. *See Chapman v. Fargo,* 223 N.Y. 32, 119 N.E. 76 (1918); *Czarnikow-Rionda Co. v. Federal Sugar Refining Co.,* 255 N.Y. 33, 43, 173 N.E. 913, 915–16 (1960). New York cases have likewise stated that mere notice of the general purpose to which a product will be put is not enough to charge the vendor with consequential damages. *Czarnikow-Rionda, supra,* at 916; *Chapman v. Fargo,* 223 N.Y. 32, 37, 119 N.E. 76, 77 (1918); *A. O. Anderson Trading Co. v. Brody,* 205 App.Div. 47, 199 N.Y.S. 128 (1923); *Tracton v. A. & O. Novelties Co.,* 32 Misc.2d 991, 223 N.Y.S.2d 565 (1961).

These New York cases and others like them were based on § 150 of the New York Personal Property Law, which set out the standard for general damages for breach of warranty, and specifically required special circumstances for any additional recovery.

6. The measure of damages for breach of warranty is the loss directly and naturally resulting, in the ordinary course of events, from the breach of warranty.

7. In the case of breach of warranty of quality, such loss, in the absence of special circumstances showing proximate damage of a greater amount, is the difference between the value of the goods at the time of delivery to the buyer and the value they would have had if they had answered to the warranty.

New York Pers.Prop.Law § 150 (McKinney 1962) (repealed).

In contrast, the applicable provisions of the U.C.C. allow "special circumstances" to increase the general damages for breach of warranty, but appear to permit recovery of objectively foreseeable incidental and consequential damage as of course (unless they are disclaimed under § 2–719(3)), *without* any showing of special circumstances.

2. The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

3. In a proper case any incidental and consequential damages under the next section may also be recovered.

U.C.C. § 2–714. The next section provides in part:

2. Consequential damages resulting from the seller's breach include

(a) any loss resulting from the general or particular requirements and needs of which the seller at the time of contracting had reason to know . . . .

Thus, the old "tacit agreement" test seems to have been rejected by the U.C.C., as Comment 2 to § 2–715 confirms.

G.E. argues that there has been no change in New York Law. Although we have found no New York case directly addressing the matter, we observe post-U.C.C. cases have routinely allowed consequential damages apparently on the basis of only objective foreseeability. *See, e. g., United Equities Co. v. First Nat'l City Bank,* 374 N.Y.S.2d 937, 84 Misc.2d 441 (1975); *Itoh v. Kimi Sales Ltd.,* 74 Misc.2d 402, 345 N.Y.S.2d 416 (1973). The cases cited by GE that postdate the Code in New York but that apply the old "tacit agreement" test are conspicuously non-Code cases—*i. e.,* they do not involve the sale of goods. *See Long Island Lighting Co. v. City of Glen Cove,* 64 Misc.2d 768, 315 N.Y.S.2d 656 (1970) (contract to pave sidewalk); *437 Fifth Co. v. Barton Realty Corp.,* 23 A.D.2d 168, 259 N.Y.S.2d 496 (1965) (landlord/tenant). Commentators uniformly line up behind an "objective foreseeability" test for U.C.C. §§ 2–714, 715. *See, e. g.,* White & Summers, Uniform Commercial Code § 10–4, at 316 (1972). Pennsylvania, the only jurisdiction that applied the tacit agreement test under the Code, *see Keystone Diesel, supra* note 63, has since changed its position and endorsed the objective foreseeability test, *see R. I. Lampus Co. v. Neville Cement Products Corp.,* 474 Pa. 199, 378 A.2d 288 (1977) & note 63 *supra.* Thus for New York to follow the tacit agreement test would make it an aberrational jurisdiction, which we are not inclined to presume. Altogether, we are satisfied that New York law after the Code, which is the relevant New York law for this case, *see* note 50 *supra,* has rejected the "tacit agreement" test of *Keystone Diesel* and follows the rule of objective foreseeability.

The critical question at this point would be whether it was objectively foreseeable that PP&L would incur the cost of replacement power if GE breached its warranty. Were it necessary to decide the question, we might well answer "yes." The parties were not jousting with windmills then when they litigated general and consequential damages, for under Pennsylvania law, *see* note 63 *supra,* it would appear that GE would not be liable for consequential damages whereas under New York law it very well might be. Nevertheless, our finding that the terms of Article 16, when construed in light of trade usage and course of dealing, affirmatively excluded costs of replacement power under U.C.C. § 2–719 makes an ultimate decision of the issue unnecessary.

that question as to breach of warranty, for whether cost of replacement power is general or consequential, it can be and has been affirmatively excluded as a possible remedy for brea'h of warranty under Article 16 U.C.C. § 2–719(1)(a), (3).

■ We turn now to Article 17 Entitled "Delay." Article 17 reads as follows:

The Seller shall be held responsible for any damages *of a general nature* which the Purchaser and/or the Owner may incur due to any delay in delivery or in the completion of the work hereunder as a result of causes within the Seller's reasonable control *and shall be held responsible only for such special damages as are specifically and clearly referred to in the Order.* In the event of any delay due to causes beyond the Seller's reasonable control, such as acts of God, acts of the Purchaser and/or the Owner, acts of civil or military authority, priorities, fires, strikes, floods, epidemics, quarantine restrictions, war, riot, delays in transportation, car shortages, and inability due to causes beyond its reasonable control to obtain necessary labor, materials, or manufacturing facilities, the date of delivery shall be extended for a period equal to the time lost by reason of the delay. (emphasis added.)

PP&L's argument that Article 17 does not exclude cost of replacement power is again best stated by rescribing a portion of its Trial Brief:

Liability of the Seller under Article 17 is completely unrelated to the question of whether the equipment furnished under the contract was defective. Article 17 focuses on delay and makes the Seller liable for two distinct types of delay—delay in delivery or delay in completion of the work under the contract—so long as such delay is "a result of causes within the Seller's reasonable control." The second sentence of Article 17 goes on to define reasons for delay which are beyond the Seller's reasonable control. Thus, although one reason for liability under Article 17 may be defective equipment,

there may be many other reasons for delay which are also within the supplier's reasonable control. Under Article 17, PP&L need not prove a defect in equipment but only that PP&L was damaged by delay in delivery or completion of work by a supplier for reasons within the supplier's reasonable control.

\* \* \* \* \* \*

Not only are Article 16 and 17 completely different in purpose and effect, but also damages for delay simply cannot be measured in terms of the cost of repairing or replacing defective parts or materials. The damage incurred by the customer because of delay bears absolutely no relation to the cost of a new part. There may be severe damage caused by delay and yet no defective parts that need replacing. Under the suppliers' interpretation of Article 16 as a ceiling on all damages, PP&L would be deprived of any remedy for delay and Article 17 would disappear from the contract. Section 2–719(2) of the Uniform Commercial Code provides:

"Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this Act."

As explained in the comment to Section 2–719:

"[I]t is of the very essence of a sales contract that at least minimum adequate remedies be available. If the parties intend to conclude a contract for sale within this Article they must accept the legal consequence that there be at least a fair quantum of remedy for breach of the obligations or duties outlined in the contract. . . . [U]nder subsection 2, where an apparently fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provisions of this Article." Comment 1

Therefore, assuming arguendo that the suppliers are correct that Article 16 pro-

vides the measure of damages for breach of all provisions of the contract, PP&L would necessarily be entitled to the full panoply of Code remedies for breach of the delay provision as the remedy provided in the contract fails to afford PP&L any remedy at all.

PP&L Trial Brief at 46–48. The argument with respect to Article 17 concludes by asserting that "damages of a general nature" under Article 17 includes cost of replacement power. PP&L advanced this argument through extensive analysis of the distinction between general and special damages, a point we addressed in note 62 *supra* and to which we shall return *infra.*

Initially, as we did with Article 16, we make a few preliminary observations as to the scope of liability under Article 17. We make no suggestion as to what sort of contract breaches PP&L may be able to demonstrate at trial, but note that much of what PP&L seeks to characterize as "delay," and so governed by Article 17, would seem in actuality to be operational flaws covered by Article 16. PP&L seems to take the position that anything that delayed full power generation is covered by Article 17, unless that delay is caused by a defective part. *See* PP&L's Preliminary Pretrial Memorandum 4. In fact, Article 17 seems on its face to be considerably narrower than that and to apply to the situation where the equipment was not delivered and in place by the agreed upon time. Ultimate decision of this issue will probably depend on the construction given to "delay . . . in completion of the work hereunder"; that is, is "completed work" under the Article 17 work as initially completed by GE or only that work that results in the successful operation warranted in Article 16? Although our initial reaction is to assume the former, we do not preclude the possibility of the latter.

Whatever the scope of the "delay" that is ultimately held to be covered by Article 17, it is clear from the text that only general damages are recoverable for that delay.

Thus we must confront head-on the question that we avoided relative to Article 16: is cost of replacement power a general or special (consequential) damage? In footnote, *see* note 62 *supra,* we concluded that for breach of warranty, cost of replacement power is a special or consequential damage. This conclusion was based on case law and the "ordinary" measure of damages for breach of warranty under the U.C.C.

Where the breach is of a "delay" provision as is asserted here, however, the Code does not set out an "ordinary" measure of damages, and we are confronted by the quandary posed by either including or excluding cost of replacement power as a general damage for delay. More specifically, with or without analysis of the nature of general and special damages, *see* note 62 *supra,* the following questions arise: If cost of replacement power is a general damage, what damage, the exposure to which was a meaningful risk, was excluded by striking out special damages (except "such special damages as are clearly referred to in the Order")? On the other hand, and more troubling, if cost of replacement power is a special damage, what meaningful sort of remedy is left available to PP&L as a general damage? To be sure, PP&L claims other damages for delay, to wit "extra labor and overhead costs," PP&L's Preliminary Pretrial Memorandum 4, but cost of replacement power and these other damages may well be of similar genre. That is, analysis of the "generalness" or "directness" or "naturalness" of any of them, *see* note 62 *supra,* might lead to the same result for all of them. Thus, to give a limited remedy for delay, the apparent intent of Article 17, is arguably impossible on the grounds that the result is all or nothing.

Subject to the caveat stated at note 65 *infra,* our musings are ultimately unnecessary, however, because of the factual context in which these contracts were conceived. Whatever in the abstract a "general" damage for delay is or is not, our factual findings establish that beyond question

the parties themselves neither intended nor anticipated that cost of replacement power was such a general (recoverable) damage. Our findings of fact make clear that in semantic (and in substantive) terms the parties considered cost of replacement power to be a special or consequential and not a general damage and that it was never the intention of the parties that GE would be liable for cost of replacement power for *any* sort of contractual breach—warranty, delay, or otherwise.

■■■ Against such a background our task is simplified. Pursuant to § 2–719, we conclude that the agreement of the parties under § 1–201(3) as that agreement is clarified and amplified by course of dealing and usage of trade, *see* U.C.C. § 1–201(1)–(5), was to exclude cost of replacement power as a damage for delay recoverable by PP&L against GE under a contract theory. This is so regardless of what else may or may not be a special damage for delay. The question presently before us for decision is whether cost of replacement power is recoverable; we do not decide any other items of damage. Thus, we do not decide the scope of special damages for delay; whatever else is a special damage, therefore unrecoverable, cost of replacement power is such.[65]

65. Having so concluded we must nonetheless add a caveat, for that conclusion may be subject to revision if exclusion of cost of replacement power as a recoverable item of damage would cause Article 17 to fail of its essential purpose. U.C.C. § 2–719(2). Our "musings," as we have referred to them, have already framed this issue and stated the problem. Resolution thereof will depend upon evidence introduced at final trial on the merits. Failure of essential purpose would occur if evidence on recoverable damages under the wording of Article 17 shows that *no* damages were recoverable, and that such a result would frustrate the parties' contractual intent. Of course, if the extra labor and overhead costs referenced in PP&L's preliminary pretrial memorandum are recoverable general damages, there can be no failure of purpose.

66. Neither do these Articles expressly exclude claims for breach of implied warranty, but exclusion of breach of implied warranty is not particularly troublesome, for that is a contractual remedy and, on the basis of the foregoing discussion, we do not find it even remotely controversial to hold that the terms of Articles

(b) *Limitation of Recovery for Negligence and Strict Liability*

■■■ As we have suggested, the foregoing analysis does not conclude this discussion. For, we must still confront the fact that neither Article 16 nor Article 17 on its face mentions, much less excludes, claims by the utility customer against the equipment supplier for negligence or strict liability.[66]

We find substantial guidance on the question of limitation of liability, as it relates to a claim of negligence, in the Third Circuit's opinion in *Posttape, supra.* In that case, plaintiff, a producer of documentary films, sought increased costs and lost profits as damages when the defendant supplied defective film for one of the plaintiff's projects. Defendant, on the other hand, sought to limit its liability to replacement of the film. Suit was brought on theories of breach of warranty, negligence, and strict liability. On the negligence issue, the court of appeals observed that although Pennsylvania law permits parties to relieve themselves contractually of the consequences of negligent conduct, any agreement to do so must spell out that intention with particularity.[67] The court found it

16 and 17, construed in the light of course of dealing and trade usage, limit GE's liability as against such claims.

67. Among the leading Pennsylvania cases on this point are *Keystone Aeronautics Corp. v. R. J. Enstrom Corp.*, 499 F.2d 146 (3d Cir. 1974); *Neville Chemical Co. v. Union Carbide Corp.*, 422 F.2d 1205 (3d Cir. 1970); *Employers Liability Assurance Corp. v. Greenville Business Men's Ass'n*, 423 Pa. 288, 224 A.2d 620 (1966). A leading New York case is *Willard Van Dyke Productions, Inc. v. Eastman Kodak Co.*, 12 N.Y.2d 301, 239 N.Y.S.2d 337, 189 N.E.2d 693 (1963). We discussed a number of these cases in *Ebasco I*, 402 F.Supp. at 429–30. The parties, in their trial and post trial briefs, have cited scores of these cases, mostly from other jurisdictions, and analyzed and cross-analyzed them, comparing their facts to those at bar. We do not find it useful, particularly in view of the length of this opinion, to review the legion of cases in this area. Nor, in view of our essentially narrow holding, which is bottomed upon our factual findings, do we find it necessary.

noteworthy that in the case before it the defendant did not seek complete exculpation, but only to limit recovery, and observed that no Pennsylvania case established the standards for an agreement to limit but not to eliminate damages caused by negligence.[68] As the *Posttape* court observed, the difference between exculpation and limitation is a real one, *see Cyclops Corp. v. Home Insurance Co.*, 389 F.Supp. 476 (W.D.Pa.), *aff'd*, 523 F.2d 1050 (3d Cir. 1975), which becomes even more important where the direct damages are substantial.

Addressing this problem, the court first recognized the "problems engendered by the overlapping of tort and sales law," 537 F.2d at 755. It then turned to the U.C.C. for guidance in the absence of clear Pennsylvania law because "in commercial sales transactions, at least those in which no personal injury or physical property damage is involved: the Uniform Commercial Code plays a predominant role in governing the relationships between buyer and seller." *Id.* The Third Circuit concluded:

> The Erie light is not always a bright one and at times we must tread in uncertainty. But having come to a fork in the road, we must make a choice, though the signs may be difficult to read. The [Uniform Commercial] Code is there to be seen and we think the Pennsylvania courts would turn toward it were they deciding the case *sub judice*.

> There seems to be no dispute that Pennsylvania law permits an agreement to restrict damages in circumstances such as those present here. Lacking an opinion of the Pennsylvania Supreme Court to the contrary, we believe that the legislative mandate of the Commercial Code, particularly §§ 2–719 and 1–201(3), sets forth criteria for such an agreement whether the claim be in tort or contract.

537 F.2d at 756.

Thus, the Third Circuit has held that in a suit between commercial entities under Pennsylvania law, the standards that govern an agreement to limit liability under § 2–719 in contract—*i. e.*, a § 1–201 "agreement," which includes the parties' particular course of dealing as well as the general usage in the trade—also govern an agreement to limit negligence liability. Obviously, even in the commercial context an agreement to limit contract remedies is not automatically an agreement to limit tort remedies; intent to limit one sort of remedy is not necessarily intent to limit the other. However, after *Posttape*, the calipers used in measuring the "particularity" of the two agreements are the same.

The import of the *Posttape* decision and its effect here are perhaps best understood against the background of its predecessor in the Third Circuit, *Keystone Aeronautics Corp. v. R. J. Enstrom Corp.*, 499 F.2d 146 (3d Cir. 1974). In *Keystone*, plaintiff had purchased three used helicopters from defendant. One of those helicopters thereafter crashed, substantially damaging the aircraft but not resulting in any personal injury. The purchase agreement for that helicopter contained a provision that stated:

> "Customer takes 'as is' without warranty of any kind except Enstrom will convey good title."

499 F.2d at 148. Under the heading "Warranty Exclusions," the purchase agreement provided:

> The R. J. Enstrom Corporation will be held harmless of any liability in connection with this sale.

> Sale of these helicopters is unconditional and no warranty of any kind is made or implied.

*Id.* When Plaintiff sued for damages based on allegations of negligence and strict lia-

---

**68.** The Court's emphasis on the fact that defendant only sought to limit liability for negligence but not to avoid it might suggest that a somewhat less rigorous standard of "particularity" might be applied to such situations than is applied when defendant seeks to leave the plaintiff wholly without remedy. However, the Court did not develop the point and remarked that "in most cases the same rules should apply as in the exculpatory clause situation." 537 F.2d at 755.

bility,[69] the defendant argued that the liability limitations were sufficient to exclude claims for negligence and strict liability. Although the district court had agreed with defendant and rendered summary judgment on its behalf, the Third Circuit reversed and held that the disclaimer language used in the purchase agreement did not clearly extend beyond disclaimer of warranty and reach claims of negligence in terms adequate "to express the clear and unequivocal intent necessary to exculpate the defendant from negligence." 499 F.2d at 150. However, the mere fact that the agreement's disclaimer language did not on its face meet the requisite particularity threshold did not mean that negligence liability might not still be limited. The court did not rule out the possibility that extrinsic evidence might make the agreement sufficiently explicit to pass muster under Pennsylvania's "particularity" rule for liability disclaimers.

A review of the record shows that the district court was called upon to consider only the phraseology of the purchase agreement itself. No discovery was had, nor were there any affidavits filed to establish whether the "purchase agreement" was only a part of a more comprehensive contract. Furthermore, no request was ever made to the district judge that testimony be taken to resolve the meaning of ".  .  . held harmless of any liability in connection with this sale .  .  ." as found in the agreement.

Since the entry of summary judgment was error, the case will be remanded. We do so without prejudice to the rights of the parties to introduce further testimony of documentation, if such be available, after due consideration of the provisions of the parol evidence rule.

When language used is unclear and ambiguous, evidence of attendant circumstances may enable the court to determine what the parties intended by a writing. *In re Plasterer's Estate*, 413 Pa. 513, 198 A.2d 525 (1964). Similarly, parol evidence is admissible to show that the writing in question was not intended to and did not properly state the entire agreement between the parties. *Dunn v. Orloff*, 420 Pa. 492, 218 A.2d 314 (1966).

If there is no further testimony which can be added or if it fails to give the agreement the explicitness required by the decisions of the Pennsylvania appellate courts, then the case must proceed to disposition on the merits of the negligence .  .  . [claim].

499 F.2d at 150–51.

We have no difficulty in distinguishing the record of this case from the bare language of the purchase agreement in *Keystone* and in finding that the standards enunciated in *Posttape* are satisfied here. As in *Posttape*, we do not deal in this case with attempts at complete exculpation, but only with limitation of liability.[70] Moreover, the question before us is not whether the phraseology of Ebasco's Articles 16 and 17, unembellished by trade usage and unmodified by course of dealing, would be sufficiently more explicit than the disclaimer in *Keystone* to effectively insulate GE from PP&L's claims for cost of replacement power that sound in negligence. Our finding of limitation for contract damages was based on, *inter alia*, the ample and frequent declarations found in the record that Ebasco's terms did not impose liability for cost of replacement power. Put differently, the parties themselves time and again spoke to each other and to third persons, stating what they understood the Ebasco terms to mean and what kinds of remedies they understood them to exclude. The lacunae of the *Keystone* record have here been filled, and we are satisfied that the parties included negligence remedies no less than con-

---

**69.** Plaintiff also originally alleged breach of warranty, but that claim was abandoned in the trial court.

**70.** There is, under Ebasco's Article 16, the possibility of very substantial liability for replace-

ment or repair (or the cost thereof) and for other additional costs as are necessary to satisfactorily cure all defects.

tract remedies when they said that GE would not be liable for cost of replacement power. Judge Carter put it well in *American Electric Power Co. v. Westinghouse Electric Corp.*, 418 F.Supp. 435 (S.D.N.Y. 1976), also a suit by a utility against an equipment supplier in which consequential damages were sought as a result of alleged failure of a steam turbine generator:

> [I]t must be emphasized that the contract here in issue is not of the type entered into by the average consumer, but a commercial agreement painstakingly negotiated between industrial giants. Further, the rule that the agreed-upon allocation of commercial risk should not be disturbed is particularly appropriate where, as here, the warranted item is a highly complex, sophisticated, and in some ways experimental piece of equipment. Moreover, compliance with a warranty to repair or replace must depend on the type of machinery in issue. In the case of a multi-million dollar turbine-generator, we are not dealing with a piece of equipment that either works or does not, or is fully repaired or not at all. On the contrary, the normal operation of a turbine-generator spans too large a spectrum for such simple characterizations. It is for this very reason that the Mitchell Unit I contract incorporates within it the limitation on the Seller's liability.

418 F.Supp. at 458 (footnote omitted).[71]

We do not quote Judge Carter's language in a vacuum, for, in addition to our (dispositive) findings on course of dealing and trade custom, we have found that.

(a) [B]ecause of the size, complexity, high speeds, critical tolerance and innovative nature of such equipment, frequent forced or scheduled outages are inevitable and cannot be completely eliminated in spite of the extraordinary care and precision with which such machinery is designed, manufactured, or operated.

(b) The potential financial risk of these outages is too great for the suppliers to assume under the prices that are charged for the equipment. Furthermore, they could not be predicted or calculated with any precision.

(c) Utilities can manage and control the risk more efficiently and at less cost than the suppliers.

Note 28, *supra*.

These factors, known to PP&L and Ebasco as well as to GE, add eloquent support to our conclusion that the parties intended to limit GE's liability to replacement or repair and to exclude liability for cost of replacement power, regardless of the legal theory under which it might be claimed.

Even without *Posttape*, we think that in the commercial, arm's-length bargaining situation of this case the kind of specificity supplied by the course of dealing and trade usage that we have found would make the parties' intent sufficiently clear to pass muster under the most rigorous specificity requirement. With *Posttape*, we unhesitatingly conclude that the limitation of liability that we have found to exist relative to the breach of contract claim also subsumed exclusion of claims for cost of replacement power founded upon allegations of negligence. Thus, while Articles 16 and 17 are not explicit on their face as to exclusion of liability for negligence,[72] they must be construed to exclude claims for cost of replacement power founded upon a negligence theory.

*Posttape* and *Keystone* also shed light on the strict liability question. Indeed, *Keystone*'s discussion of Pennsylvania's particularity requirement for limitation of liability

---

**71.** Judge Carter's opinion in *American Electric Power* suggests to us that New York's law is in accord with the spirit of *Posttape*. *See* 418 F.Supp. at 452–53, 455 n. 36.

**72.** We note again, however, that Article 16 does contain a limitation that seller's liability shall in no event exceed the cost of replace-ment or repair and that Article 17, by providing liability only for general damages, impliedly excludes liability for consequential damages, including cost of replacement power (the parties and the trade deeming cost of replacement power to be a consequential damage).

by its own terms encompassed actions sounding both in negligence and in strict liability under Restatement Second of Torts § 402A. *See* 499 F.2d at 150–51. The *Keystone* court⁺ was satisfied that, assuming sufficient explicitness and particularity, just as negligence liability could be limited by agreement between the parties to a commercial transaction, so too could the strict liability provisions of § 402A be waived where the sale was purely a commercial transaction between two knowledgable commercial entities that consciously negotiated terms and price, at least where only property damage is at issue. This conclusion was reached despite the provisions of Comment m to § 402A, which on its face seems to render void any attempt to disclaim the effects of § 402A liability.[73] The court of appeals reasoned:

> If a disclaimer on the label of a product or in a printed form sales contract would be effective to limit liability under § 402A, then obviously sellers would utilize such devices to nullify their responsibility. And it is significant that the application of § 402A is limited to a ". . . product in a defective condition unreasonably dangerous . . ."
> A social policy aimed at protecting the average consumer by prohibiting blanket immunization of a manufacturer or seller through the use of standardized disclaimers engenders little resistance. But when the setting is changed and the buyer and seller are both business entities, in a position where there may be effective and fair bargaining, the social policy loses its *raison d'être*. The transaction then tends

to be more influenced by gravitational pull of the Uniform Commercial Code than by the consumer oriented § 402A.

> Since the Code is tolerant of disclaimers and limitation clauses within certain defined limits, that same philosophy would be equally approving of a negotiated waiver of § 402A. Such a limitation on comment m would avoid the not unfamiliar result of "overkill" when a legal principle completely valid in its original context is extended so far that the mischief caused may be equal to the original disorder sought to be remedied.

499 F.2d at 149 (footnotes omitted). However, as it had with regard to the negligence claims, the *Keystone* court held that the disclaimers contained in the purchase agreement were insufficient, in the absence of any clarification that might be provided by extrinsic evidence (such as trade usage or course of dealing), to insulate the seller from § 402A liability. There was no indication in the opinion that, in the nonconsumer context of sales between commercial interests where no personal injury is alleged, different requirements would be mandated for limitation of § 402A liability than were mandatory for negligence liability; the two concepts were treated uniformly.

■■■ *Posttape* did not directly address the question of the requirements for limitation of § 402A liability by agreement. The conclusion that the standards for U.C.C. limitation of liability were also applicable to assessing an attempted limitation of negligence liability was directed at the negligence situation only. The § 402A claim in

---

**73.** Comment m provides, *inter alia* :

The rule stated in this Section is not governed by the provisions of the Uniform Sales Act, or those of the Uniform Commercial Code, as to warranties; and it is not affected by limitations on the scope and content of warranties, or by limitation to "buyer" and "seller" in those statutes. Nor is the consumer required to give notice to the seller of his injury within a reasonable time after it occurs, as is provided by the Uniform Act. The consumer's cause of action does not depend upon the validity of his contract with

the person from whom he acquires the product, and it is not affected by any disclaimer or other agreement, whether it be between the seller and his immediate buyer, or attached to and accompanying the product into the consumer's hands. In short, "warranty" must be given a new and different meaning if it is used in connection with this Section. It is much simpler to regard the liability here stated merely as one of strict liability in tort. The reader will observe comment m's frequent use of the word "consumer."

that case was disposed of on other grounds. *See* discussion *infra.* But nothing in the opinion in any way casts doubt on the clear approach of *Keystone* to consider the two sorts of liability—negligence and § 402A—together for limitation of liability purposes, at least in the commercial context. In light of the strong policy expressed in *Keystone* that

> . . . freedom of contract should be permitted so that a corporate purchaser may exercise its business judgment to forego claims for liability against the seller in exchange for a lower price,

499 F.2d at 149, and the court's stated conclusion that

> Pennsylvania law does permit a freely negotiated and clearly expressed waiver of § 402A between business entities of relatively equal bargaining strength,

*id.,* we think that the same standards that govern agreements to limit contract and negligence liability in Pennsylvania—*i. e.,* an agreement to do so that satisfies U.C.C. §§ 1–201(3) & 2–719—also govern agreements to limit § 402A liability.[74]

■ Based on our reading of the Third Circuit's exposition of Pennsylvania law in *Keystone* and *Posttape*, we conclude that parties to a commercial transaction may agree to limit § 402A liability and that even as against § 402A claims, Ebasco's Articles 16 and 17 should be construed in a manner consistent with the principles of the U.C.C. that permit contracting parties (here giant corporations) to limit the seller's liability to discrete contract remedies, such as cost of replacement or repair, and concomitantly to exclude liability for items such as cost of replacement power. We are satisfied that the parties' course of dealings and the general trade usage clearly establish that the parties did not intend that GE would be liable to PP&L for cost of replacement pow-

er under *any* theory of liability, including strict liability under § 402A. Thus, while Articles 16 and 17 are not explicit on the point, they must be construed to exclude claims for cost of replacement power based on § 402A. And see note 72 *supra.*

PP&L's claim against GE for cost of replacement power grounded on alleged strict liability must fail for another reason as well. The *Posttape* court called attention to the uncertainty existing in the law over the question whether § 402A is even available as a cause of action in commercial contexts such as the one now before us.

Typical of the controversy generated by this [overlapping of tort and sales law] is the lively scholarly debate about the proper scope of § 402A of the Restatement (Second) of Torts as opposed to the provisions of the Uniform Commercial Code. The superiority of § 402A to compensate the average consumer for personal injury or property damage from a defective product is commonly acknowledged. However, there is considerably less enthusiasm for its application in a commercial setting when the damages are consequential and arise from a nondangerous impairment of quality of the product. In this context, even Chief Justice Traynor, an ardent advocate of § 402A under other conditions, has favored the provisions of the Uniform Commercial Code. *See Seely v. White Motor Co.,* 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965). *Accord,* Titus, Restatement (Second) of Torts Section 402A and the Uniform Commercial Code, 22 Stan.L. Rev. 713 (1970); Speidel, Products Liability, Economic Loss and the UCC, 40 Tenn. L.Rev. 309 (1973). A contrary view was espoused by the New Jersey Supreme Court in *Santor v. A and M Karagheusian, Inc.,* 44 N.J. 52, 207 A.2d 305 (1965). Pennsylvania has not yet made its posi-

---

74. It is apparent that in some jurisdictions, if § 402A is applicable in a given situation, Comment m, *see* note 73 *supra,* is read literally. In such jurisdictions strict liability may not be disclaimed or limited by agreement. *See, e. g.,*

*Iowa Electric Light & Power Co. v. Allis-Chalmers Mfg. Co.,* 360 F.Supp. 25, 27–28 (S.D.Iowa 1973). Of course, the question whether § 402A is applicable at all, *see* discussion *infra,* would still remain.

tion clear. *See Kassab v. Central Soya,* 432 Pa. 217, 246 A.2d 848 (1968); *Miller v. Preitz,* 422 Pa. 383, 221 A.2d 320 (1966). Murray, Pennsylvania Products Liability: A Clarification of the Search for a Clear and Understandable Rule, 33 U.Pitt.L. Rev. 391 (1972).

537 F.2d at 755–56.

Although, as the *Posttape* court observed, Pennsylvania has not made its position clear, other jurisdictions have aligned themselves with the position, taken by California in *Seely v. White Motor Co.,* 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965), that § 402A does not apply to cases of purely commercial loss. *See, e. g., Fredonia Broadcasting Corp., Inc. v. RCA Corp.,* 481 F.2d 781 (5th Cir. 1973); *Southwest Forest Industries, Inc. v. Westinghouse Electric Corp.,* 422 F.2d 1013 (9th Cir. 1970); *Iowa Electric Light & Power Co. v. Allis-Chalmers Mfg. Co.,* 360 F.Supp. 25 (S.D.Iowa 1973); *Noel Transfer and Package Delivery Service, Inc. v. General Motors Corp.,* 341 F.Supp. 968 (D.Minn.1972). *See generally* White and Summers, Uniform Commercial Code 295 (1972) ("The most obvious difference between the [merchantability standard and the strict tort standard] is that the strict tort standard is considerably narrower in scope. It does not purport to reach all defective goods but only those that are not only defective but also 'unreasonably dangerous,' that is those that have the capacity to cause personal injury or property damage as opposed to those which cause only economic loss."). Even New Jersey, apparently the only jurisdiction that has expressly extended the concept of strict products liability to permit recovery for purely economic loss (this extension was in a consumer context), *see Santor v. A and M Karagheusian, Inc.,* 44 N.J. 52, 207 A.2d 305 (1965), may have given some indication that its position would be modified somewhat in a wholly commercial setting. *See Moreia Construction Co., Inc. v. Moretrench Corp.,* 97 N.J.Super. 391, 235 A.2d 211 (1967), *aff'd,* 51 N.J. 405, 241 A.2d 236 (1968). *Cf. Rosenau v. City of New Brunswick,* 51 N.J. 130, 238 A.2d 169, 175 (1968).

*Posttape* appears to have gone a long way toward resolving this conflict for Pennsylvania, at least to a degree sufficient to guide our decision in this case. The only alleged defect in the film sold to the *Posttape* plaintiff was a scratched surface, which made the film commercially useless. Section 402A provides that if certain conditions are met,

> [O]ne who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property. . . .

The *Posttape* trial court had interpreted § 402A to permit recovery if the scratches on the film constituted a defect that was unreasonably dangerous to the property of the plaintiff, including the film itself. The court of appeals rejected such a reading of § 402A, and held that the question of § 402A liability should not even have gone to the jury.

> The flaw in the film in no way made it a threat to person or tangible property. The product was defective and did not perform as expected, but by no stretch of the imagination could it be considered "unreasonably dangerous." There was no evidence from which a jury could reach that conclusion, and the trial court erred in submitting the question of § 402A liability. Accordingly, Kodak's motion for judgment on that count should have been granted.

537 F.2d at 755. Fairly read, this language gives Pennsylvania a strong push toward the position of California and most other jurisdictions. Under *Posttape,* it simply is not enough, in order to invoke § 402A, that the defect reduced the commercial value of the defective item.

■ GE asks us to declare that in Pennsylvania parallel remedies in tort and contract are unavailable in the commercial context. We decline to go that far, and we need not reach that question. *But cf. Iron Mountain Security Storage Corp. v. Ameri-*

can *Speciality Foods, Inc.*, 457 F.Supp. 1158 at 1165–1169 (E.D.Pa. 1978, Luongo, J.). Reading *Posttape* no more broadly than is necessary in the context of this case, we conclude that in the present situation where, in a purely commercial context, a contract is made between large industrial corporations who have clearly intended to exclude cost of replacement power as an item of damages, regardless of the theory of liability under which it is asserted (contract, negligence, or strict liability), and where no personal injury is involved but instead the only claim is for consequential damages in the nature of replacement power,[75] § 402A is not a remedy available to override the parties liability-limiting agreement.[76]

## IV. *Conclusion*

We have at long last answered the second and principal question posed by our trial: "Is the cost of replacement power recoverable by PP&L as an item of damages against the various defendants on PP&L's counterclaim, assuming arguendo that PP&L can establish liability against them"? The answer is "No."

This answer, however, does not conclude this case, for there are numerous damage claims asserted by PP&L against GE other than for cost of replacement power, and final trial on the merits must now be scheduled. We shall hold a final pretrial conference on October 9, 1978, at 2:00 p.m. to review those matters and to set a date for the final trial. Counsel for GE shall submit an appropriate form of Order.

**75.** PP&L does assert a claim for breakage of turbine blades resulting from failure of the test stage buckets, and some resulting damage to other parts of the turbine, but that is not a major factor in the case and is discrete from the claim for cost of replacement power. In any event, we do not think that asserted internal damage to the turbine resulting from allegedly defective turbine parts is a sufficient distinction from *Posttape* to remove this case from the commercial (nonconsumer) setting that the *Posttape* court found to be determinative in the context of disclaimer of tort liability. *Cf. Keystone supra.*

**76.** Although we can find no New York case directly on point, we are satisfied that our decision is also consistent with New York law. Historically, although New York does permit a tort action between contracting parties if there is a breach of a legal duty separate and distinct from the breach of contract, *see e. g., Bender v. Candee Smith & Harland Co.*, 136 N.Y.S.2d 425 (1954); *Albemarle Theatre, Inc. v. Bayberry Realty Corp.*, 27 A.D.2d 172, 277 N.Y.S.2d 505 (1962), New York has been sensitive to the differences between remedies in contract and tort, and cautious in letting the remedies for one sort of legal wrong coalesce with the remedies for the other. *See, e. g., Skouras & Brut Productions, Inc., et al.*, 45 App.Div.2d 646, 360 N.Y.S.2d 811 (1974); *Friedman v. Roseth Corp.*, 270 App.Div. 988, 62 N.Y.S.2d 663, *aff'd*, 297 N.Y. 495, 74 N.E.2d 192 (1946); *Rich v. New York Central & H.R.R. Co.*, 87 N.Y. 382 (1882). Moreover, New York clearly recognizes the important difference between commercial disputes in which only economic loss is alleged and consumer actions in which personal injury is involved. *See, e. g., Victorson v. Bock Laundry Machine Co.*, 37 N.Y.2d 395, 373 N.Y.S.2d 39, 335 N.E.2d 275 (1975); *id.*, 37 N.Y.2d at 404, 373 N.Y.S.2d at 45, 335 N.E.2d at 280 (concurring opinion of Fuchsberg, J.). It is, of course, this difference that has led other jurisdictions to limit the applicability of § 402A in commercial contexts. Thus, we believe that the conclusion we have reached in the text would be no different were we to apply New York rather than Pennsylvania law.